# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| ITW GLOBAL INVESTMENTS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N14C-10-236 JRJ CCLD |
| | ) | |
| AMERICAN INDUSTRIAL PARTNERS | ) | |
| CAPITAL FUND IV, L.P.; AMERICAN | ) | |
| INDUSTRIAL PARTNERS CAPITAL | ) | |
| FUND IV (PARALLEL), L.P.; AIPCJ IV, | ) | |
| LLC; KIM MARVIN; PAUL | ) | |
| BAMATTER; and ERIC BAROYAN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: March 24, 2015
Date Decided: June 24, 2015

*Upon Defendants' Motion to Dismiss Count I Against AIP*:
**GRANTED.**

*Upon Defendants' Motion to Dismiss Count II Against AIP*:
**GRANTED, in part,** and **DENIED, in part.**

*Upon Defendants' Motion to Dismiss Counts I through V Against the Individual Defendants*:
**GRANTED.**

Steven B. Feirson, Esquire (*pro hac vice*) (argued), Dechert LLP, Cira Center, 2929 Arch Street, Philadelphia, PA 19104, Michael H. Park, Esquire (*pro hac vice*), and Rebecca Kahan Waldman, Esquire (*pro hac vice*), Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036, Ann Mary Olson, Esquire (*pro hac vice*), Dechert LLP, One Bush Street, Suite 1600, San Francisco, CA 94014, P. Clarkson Collins, Jr., Esquire, and Meghan A. Adams, Esquire, Morris James LLP,

500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, DE 19899, Attorneys for Plaintiff.

Peter D. Doyle, Esquire (*pro hac vice*) (argued), and Seth Fier, Esquire (*pro hace vice*), Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, John E. Roberts, Esquire (*pro hac vice*), Proskauer Rose LLP One International Place, Boston, MA 02110, William D. Johnston, Esquire, and Mary F. Dugan, Esquire, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Lawrence Portnoy, Esquire (*pro hac vice*), and Jillian Rennie Stillman, Esquire (*pro hac vice*), Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attorneys for Defendants.

**JURDEN, P.J.**

# I. INTRODUCTION

Before the Court is Defendants American Industrial Partners Capital Fund IV, L.P., American Industrial Partners Capital Fund IV (Parallel), L.P., and AIPCF IV, LLC's ("AIP") Motion to Dismiss Counts I and II of the Complaint; and Defendants Kim Marvin, Paul Bamatter, and Eric Baroyan's ("Individual Defendants") Motion to Dismiss Counts I through V ("Defendants" includes AIP and the Individual Defendants).

Plaintiff ITW Global Investments Inc. ("ITW") alleges that Defendants committed fraud, fraud in the inducement, and breach of contract in connection with ITW's acquisition of Brooks Instrument ("Brooks") from AIP ("Transaction"). According to ITW, Defendants committed fraud and breached the Securities Purchase and Sale Agreement ("SPSA") by misrepresenting the financial statements and other provisions in the SPSA, and orchestrated a series of "sham sales" designed to fraudulently induce ITW to enter into an agreement it otherwise would not have entered into by artificially inflating Brooks' November 2011 sales.

In opposition, AIP argues that Count I (fraud) of the Complaint should be dismissed because it impermissibly "rehashes" the damages allegedly caused by ITW's breach of contract claim. AIP contends that Count II (fraud in the inducement) of the Complaint should be dismissed because: (1) any alleged fraud

based on misrepresentations in the SPSA constitutes an "impermissible bootstrap" to ITW's breach of contract claim; and (2) any alleged fraud based on extra-contractual statements was disclaimed in the SPSA.

The Individual Defendants contend that all counts in the Complaint should be dismissed because: (1) the Complaint fails to plead sufficient facts showing they had knowledge of the alleged misrepresentations; and (2) alternatively, this Court does not have personal jurisdiction over them.

For the following reasons, AIP's Motion to Dismiss Count I (fraud) is **GRANTED;** AIP's Motion to Dismiss Count II (fraud in the inducement) is **GRANTED, in part,** and **DENIED, in part;** and the Individual Defendants' Motion to Dismiss all counts against them is **GRANTED.**

## II. BACKGROUND

ITW, a Delaware corporation with its principal place of business in Illinois, is a public company specializing in the manufacture, sales, and service of industrial components and equipment.[1]

AIP is a middle-market private equity firm that invests primarily in industrial manufacturing businesses.[2] Kim Marvin is a Partner in AIP and resident

---

[1] Compl. ¶ 9.
[2] *Id.* ¶ 10. AIP includes American Industrial Partners Capital Fund IV, L.P., American Industrial Partners Capital Fund IV (Parallel), L.P., which are Delaware limited partnerships that are managed by AIPCF IV, LLC, a Delaware limited liability company. *Id.*

of Maryland.[3]  Paul Bamatter is a Partner in AIP, AIP's Chief Financial Officer, and a resident of Connecticut.[4]  Eric Baroyan is a Partner in AIP and a resident of New York.[5]

On December 31, 2007, AIP purchased Brooks from Emerson Electric Company.[6]  Brooks is a Pennsylvania-based manufacturing company that manufactures advanced flow, pressure, and vacuum measurement and control solutions.[7]

In September 2011, ITW and AIP began to negotiate the Transaction.[8]  On September 22, 2011, at AIP's direction, Brooks' management provided ITW with historical financial information and future financial projections that it intended ITW to use as the basis for valuing Brooks.[9]  AIP projected that Brooks' revenue would be approximately $210 million in fiscal year 2011, $247 million in fiscal year 2012, and $322 million in fiscal year 2013.[10]

On October 28, 2011, ITW delivered a Letter of Intent to purchase Brooks for $500 million.[11]  On November 3, 2011, AIP accepted the Letter of Intent, promising to operate Brooks in "a normal and customary manner" and "not to

---

[3] *Id.* ¶ 12.
[4] *Id.* ¶ 13.
[5] *Id.* ¶ 14.
[6] *Id.* ¶ 11.
[7] Compl. ¶ 11.
[8] *Id.* ¶ 23.
[9] *Id.* ¶ 24.
[10] *Id.*
[11] *Id.* ¶ 25.

5

engage in any transaction which may adversely and materially affect the decision of ITW to pursue" the purchase of Brooks.[12]

On November 10, 2011, Brooks' management informed AIP (specifically, the Individual Defendants) that Brooks' sales had fallen from $15.2 million in September 2011 to $10.8 million in October 2011—Brooks' worst sales month in 2011.[13] Brooks also informed AIP that its sales projections for November would reach only approximately $13 million.[14] When Bamatter learned of the financial results and projections, he asked Clark Hale, Brooks' Chief Executive Officer, and Waqar Nasim, Brooks' Chief Financial Officer, "is there a story that is not scary?"[15] Thereafter, according to ITW, Baroyan pushed Brooks' sales team to "book the hell out of everything we possibly can over the next 10–15 days to ease any concern ITW is going to have once they see October data."[16]

On November 18, 2011, ITW learned of the October financial results.[17] AIP explained to ITW that the October sales drop was an anomaly caused by three days of lost production due to a year-end physical inventory and a one-time unusual supplier delay.[18] AIP then provided projections that Brooks' November 2011 sales

---

[12] *Id.* ¶ 25.
[13] Compl. ¶¶ 26, 41.
[14] *Id.* ¶ 41.
[15] *Id.* ¶ 42.
[16] *Id.* ¶ 43.
[17] *Id.* ¶ 26.
[18] *Id.*

would be $17 million and December 2011 sales would be $21.5 million.[19]  After the October sales drop, ITW decided to hold off on the purchase of Brooks until after the November 2011 sales met AIP's projections.[20]

Throughout the month of November, Baroyan was in daily contact with Hale and Nasim, monitoring Brooks' progress toward AIP's $17 million sales forecast.[21] Through Baroyan and others at AIP, AIP directed Brooks to maximize its November sales.[22]

ITW alleges that AIP directed Brooks to enter into a series of "sham sales" with AIP affiliates, Ichor Systems ("Ichor") and Precision Flow Technologies ("PFT"), throughout the fall of 2011 in an effort to inflate Brooks' sales figures to meet AIP's revenue projection.[23]  ITW alleges that in order for AIP to "effectuate this scheme," in the fall of 2011, Brooks' management, including Hale (CEO) and Bhushan Somani (Vice President Global Account Management) attempted to sell a large amount of soon-to-be-discontinued products to Applied Materials, Inc. ("AMAT").[24]  When the parties were unable to reach an agreement, AIP and Brooks arranged to "sell" the products to Ichor ("Last Time Buy Agreement").[25]

---

[19] Compl. ¶ 27.
[20] *Id.* ¶ 28.
[21] *Id.* ¶ 44.
[22] *Id.*
[23] *Id.* ¶¶ 44–55.
[24] *Id.* ¶¶ 45–46.
[25] Compl. ¶ 45.

After those negotiations deteriorated, a second version of the Last Time Buy Agreement was prepared on November 21, 2011 by Geoffrey Chriswisser on behalf of Ichor, which required Brooks to repurchase up to 20 percent of the original quantity of product acquired by Ichor as part of the Last Time Buy Agreement ("partial right of return").[26] According to ITW, Brooks agreed to repurchase certain legacy products in Ichor's excess inventory at a later date in order to induce Ichor to enter into the transaction.[27] The Brooks accounting team, however, strongly objected to recording the shipments as revenue because doing so (given the partial right of return) would violate Generally Accepted Accounting Principles ("GAAP").[28]

On December 1, 2011, Chriswisser drafted a final Last Time Buy Agreement that removed the partial right of return and Brooks' obligation to repurchase Ichor-owned legacy products, but Hale simultaneously affirmed by email to Ichor's Chief Executive Officer that Brooks *would* buy back certain products later—completely inconsistent with the final Last Time Buy Agreement.[29] ITW alleges that this partial right of return inflated Brooks' revenue, making Brooks more attractive to ITW.[30] Accordingly, ITW alleges that AIP granted the partial right of

---

[26] *Id.* ¶ 48.
[27] *Id.* ¶ 47.
[28] *Id.*
[29] *Id.* ¶ 49.
[30] *Id.* ¶ 45.

return with the hope that the products would not be returned until after ITW had taken control of Brooks.[31]

ITW further alleges that AIP and Brooks effectuated a similar scheme of "sham sales" with PFT—another AIP affiliate. From September to November 2011, Brooks recorded $867,029 in sales to PFT.[32] The agreement between PFT and Brooks included an obligation for Brooks to buy back any product that had no usage for 120 days.[33] Nevertheless, even though the terms of the agreement violated GAAP, Brooks recorded the sales as revenue.[34]

On November 29, 2011, ITW and AIP entered into a second Letter of Intent whereby ITW would purchase Brooks for $425 million with a potential earn-out payment of up to $75 million.[35] Marvin signed the second Letter of Intent on behalf of AIP.[36] Because the second Letter of Intent made clear that ITW would not acquire Brooks unless ITW approved of Brooks' unaudited financial statements ending November 30, 2011, ITW alleges that AIP knew or should have known that the November 2011 sales were essential to ITW's decision whether to purchase Brooks.[37]

---

[31] Compl. ¶ 45.
[32] *Id.* ¶ 54.
[33] *Id.*
[34] *Id.*
[35] *Id.* ¶ 31.
[36] *Id.* ¶ 31.
[37] Compl. ¶ 28.

9

On December 8, 2011, AIP provided ITW with Brooks' consolidated balance sheets, statements of income, and statements of cash flow for each September 30 fiscal year from 2009–2011, as well as for October and November 2011 ("Financial Statements").[38] The Financial Statements showed that November 2011 sales were $17.8 million.[39] This prompted ITW to request a face-to-face meeting, but Marvin refused to allow ITW to meet with Brooks' management in person.[40] Instead, Marvin agreed to provide written answers to ITW's questions about the November results and allowed ITW to speak with Brooks' management by phone.[41] In its written answers, AIP assured ITW that the November financial results reflected the ordinary course of business and that the December financial projections of $21.5 million in sales would be met.[42] Actual sales, however, turned out to be only $9.8 million.[43]

On December 13, 2011, ITW and AIP entered into the SPSA whereby ITW agreed to purchase Brooks for $425 million with a potential earn-out payment of up to an additional $75 million.[44]

After the SPSA was executed in early 2012, products from Ichor and PFT started to be returned.[45] Out of the approximately $5 million in products sold to

---

[38] *Id.* ¶ 34. *See also* Defs.' Op. Br., Ex. 1 SPSA § 2.8.
[39] Compl. ¶ 34.
[40] *Id.*
[41] *Id.*
[42] *Id.* ¶¶ 35, 37.
[43] *Id.* ¶ 38.
[44] *Id.* ¶ 40.

Ichor during the fall of 2011, approximately $1.2 million in products were returned.[46] Additionally, Brooks accepted purchase orders from Ichor for certain legacy products, which ITW alleges were booked during November 2011 to induce Ichor to enter into the sham sales.[47]

## III. PARTIES' CONTENTIONS

AIP argues that Count I (fraud) of the Complaint should be dismissed because it impermissibly "rehashes" the damages allegedly caused by ITW's breach of contract claim.[48] AIP argues that Count II (fraud in the inducement) of the Complaint must be dismissed for two separate reasons. First, the fraud in the inducement claim based on the SPSA is barred as an "impermissible bootstrap" to ITW's breach of contract claim.[49] Specifically, AIP argues that both the fraud in the inducement claim and the breach of contract claim are premised on the same conduct—the alleged sham sales to Ichor and PFT.[50] Second, AIP argues that any fraud in the inducement claim based on extra-contractual statements was disclaimed under the SPSA in an anti-reliance clause.[51]

---

[45] Compl. ¶ 50.
[46] *Id.* ¶¶ 46, 59.
[47] *Id.* ¶ 53.
[48] Defendants' Opening Brief in Support of Their Motion to Dismiss at 21 (Trans. ID. 56390395) ("Defs.' Op. Br.").
[49] *Id.* at 15–17.
[50] *Id.* at 16–17.
[51] *Id.* at 18–19.

The Individual Defendants argue the Complaint fails to plead with the requisite particularity that the Individual Defendants knew the Financial Statements were false when made.[52] Alternatively, the Individual Defendants contend that this Court does not have personal jurisdiction over them because the Individual Defendants do not transact business in Delaware and do not have any contacts with Delaware.[53]

In opposition, ITW contends that its fraud in the inducement claim is not an impermissible bootstrap to its breach of contract claim because Delaware case law permits simultaneous breach of contract and fraud claims when the fraud claims relate to misrepresentations in the contract.[54] ITW further contends that the anti-reliance clause in the SPSA should not be enforced based on public policy grounds.[55]

ITW asserts it has properly alleged independent claims for fraud and fraud in the inducement against the Individual Defendants because Marvin, Bamatter, and Baroyan played a role in the negotiations of the SPSA, and the harm caused to

---

[52] Defendants' Reply Brief in Support of Their Motion to Dismiss at 12–16 (Trans. ID. 56746794) ("Defs.' Reply Br.").

[53] Defs.' Op. Br. at 26–28.

[54] Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss at 15, 17–18 (Trans. ID. 56590866) ("Pl.'s Ans. Br.").

[55] *Id.* at 19–20. ITW does not dispute that the language of the SPSA created a valid, unambiguous anti-reliance clause. *Id.* at 21.

ITW, based on their awareness of the alleged misrepresentations and the affirmative steps they took to mislead and prevent ITW from learning the truth.[56]

Finally, ITW contends that the Court has personal jurisdiction over the Individual Defendants because each of the Individual Defendants is a partner in a Delaware limited partnership, and because they entered into the SPSA—which is governed by Delaware law.[57]

## IV. STANDARD OF REVIEW

The Court assumes that all well-pleaded facts in a complaint are true when considering a Motion to Dismiss under Superior Court Civil Rule 12(b)(6).[58] Allegations are well-pleaded if they place the defendant on notice of the claim.[59] Although the pleading threshold in Delaware is low, "[a]llegations that are merely conclusory and lacking factual basis, however, will not survive a motion to dismiss."[60]

In considering a motion to dismiss under Rule 12(b)(6), the court generally may not consider matters outside the complaint.[61] However, documents that are integral to or incorporated by reference in the complaint may be considered.[62]

---

[56] *Id.* at 26, 29–30.
[57] Pl.'s Ans. Br at 34.
[58] *Brevet Capital Special Opportunities Fund, LP v. Fourth Third, LLC*, 2011 WL 3452821, at *6 (Del. Super. 2011).
[59] *Precision Air, Inc. v. Standard Chlorine of Del., Inc.*, 654 A.2d 403, 406 (Del. 1995).
[60] *Brevet Capital*, 2011 WL 3452821, at *6.
[61] Super. Ct. Civ. R. 12(b).
[62] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995).

"Where an agreement plays a significant role in the litigation and is integral to a plaintiff's claims, it may be incorporated by reference without converting the motion to a summary judgment."[63]

Because the Court finds that the SPSA is integral to and incorporated by reference in the Complaint, it will consider the terms of the SPSA without converting this motion into one for summary judgment.

## V. DISCUSSION

In order to survive a motion to dismiss a fraud claim, a plaintiff must allege that: (1) defendant falsely represented a material fact or omitted facts that the defendant had a duty to disclose; (2) defendant knew that the representation was false or made with a reckless indifference to the truth; (3) defendant intended to induce plaintiff to act or refrain from action; (4) plaintiff acted in justifiable reliance on the representation; and (5) plaintiff was injured by its reliance on defendant's representation.[64]

Superior Court Civil Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The particularity pleading standard requires a plaintiff to plead "the

---

[63] *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *4 (Del. Super. 2014).
[64] *See, e.g.*, *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

time, place and contents of the false representations."[65] However, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."[66]

ITW has alleged two counts of fraud against AIP: one for fraud, and one for fraud in the inducement.[67] Both counts as pleaded are materially identical, other than the damages sought.[68]

## A. Count I: Fraud

"Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action."[69] "[T]he damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract."[70]

Here, Count I of the Complaint pleads, "[a]s a direct and proximate result of AIP's fraudulent representations and omissions, ITW sustained damages in an amount exceeding $85 million."[71] Count III for Breach of Contract pleads: "[a]s a

---

[65] *See, e.g.*, *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990) (internal quotations omitted).

[66] Super. Ct. Civ. R. 9(b).

[67] Compl. ¶¶ 111–124.

[68] *Compare id.* ¶¶ 111–117, *with id.* ¶¶ 118–124.

[69] *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *8 (Del. Super. 2012) (quoting *Dalton v. Ford Motor Co.*, 2002 WL 338081, at *6 (Del. Super. 2002)).

[70] *Cornell Glasgow*, 2012 WL 2106945, at *8–9 (dismissing a fraud claim because the plaintiffs' damages allegation was nothing more than a "rehash" of the allegations in its breach of contract claims). *See also AFH Holding Advisory, LLC v. Emmaus Life Sciences, Inc.*, 2013 WL 2149993, at *13 (Del. Super. 2013) (dismissing a fraud claim because the plaintiff's damages allegation for fraud was not separate and distinct from its damages allegation for breach of contract).

[71] Compl. ¶ 117.

direct and proximate result of AIP's breaches, ITW has sustained damages in an amount exceeding $85 million, plus its attorney fees and costs."[72] Because ITW has pleaded materially identical damages for $85 million, they fail to separate the damages incurred by any alleged fraudulent misrepresentation and any alleged breach of contract under the SPSA. Accordingly, Count I for fraud must be dismissed because it pleads damages that are simply a "rehash" of the breach of contract damages. Because Count II for fraud in the inducement pleads damages for rescission or rescissory damages, the Court will now address Count II.

## B. Count II: Fraud in the Inducement

ITW has alleged that AIP fraudulently induced it in two ways: (1) by statements made in the SPSA; and (2) by statements made outside the SPSA with the intent to induce ITW to enter into the SPSA.

### 1. Fraud in the Inducement Based on the SPSA

A fraud claim can be based on representations found in a contract,[73] however, "where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."[74] Under Delaware law, a plaintiff "cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by

---

[72] *Id.* ¶ 130.

[73] *Ameristar Casinos, Inc. v. Resorts Int'l Holdings, LLC*, 2010 WL 1875631, at *11 (Del. Ch. 2010).

[74] *Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*, 2005 WL 445710, at *3 (Del. Super. 2005).

alleging that a contracting party never intended to *perform* its obligations."[75]

Stated differently, "a plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint."[76]  "Essentially, a fraud claim alleged contemporaneously with a breach of contract claim may survive, so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach."[77]  Allegations that are focused on *inducement* to contract are "separate and distinct" conduct.[78]

AIP relies on *MicroStrategy Inc. v. Acacia Research Corp.*, *Cornell Glasgow, LLC v. La Grange Properties, LLC*, and *Furnari v. Wallpang, Inc.* to argue that ITW's claim for fraudulent inducement based on the SPSA is an impermissible bootstrap to its claim for breach of contract.[79]  However, AIP's reliance on those cases is misplaced.  In all three cases the plaintiffs alleged fraud based on the *performance* of a contract, rather than the inducement to contract because of alleged fraudulent conduct occurring *prior* to entering the contract.

In *MicroStrategy*, the defendant had warranted in a settlement agreement that it had no present intention of bringing a patent infringement suit against the

---

[75] *Furnari*, 2014 WL 1678419, at *8 (quoting *Narrowstep Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. 2010)) (emphasis added).
[76] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *17 (Del. Ch. 2010).
[77] *Furnari*, 2014 WL 1678419, at *8 (internal quotations omitted).
[78] *See Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *16–17 (Del. Ch. 2013); *Brasby v. Morris*, 2007 WL 949485, at *6–7 (Del. Super. 2007).
[79] Defs.' Op. Br. at 15–18.

plaintiff.[80]   *After* the execution of the agreement, the defendant notified the plaintiff that the defendant planned to sue for patent infringement.[81]   The plaintiff then sued for both breach of the settlement agreement and fraud.[82]   The Court of Chancery dismissed the fraud claim as an impermissible bootstrap to the extent that the fraud claim alleged that the representation and warranty in the settlement agreement was false when defendant made it.[83]

Similarly, in *Cornell Glasgow*, the plaintiff sued for breach of contract and fraudulent inducement because the defendants delayed payment of invoices and then induced the plaintiff's "continued performance by promising payment upon receipt of additional information."[84]   The Court dismissed the fraud claim because the alleged misrepresentations all related to the defendants failed performance *after* the execution of the agreement.[85]

Finally, in *Furnari*, the plaintiff sued for breach of contract and fraudulent inducement because the defendant failed to pay amounts allegedly owed under the contract.[86]   The Court dismissed the plaintiff's fraud claim as an impermissible bootstrap to the breach of contract claim because the plaintiff failed to allege any

---

[80] 2010 WL 5550455, at *2.
[81] *Id.* at *3.
[82] *Id.* at *17.
[83] *Id.*  The Court of Chancery did not dismiss the fraud claim to the extent that the allegations fell outside the agreement based on oral assurances to fraudulently induce the plaintiff to enter into the agreement. *Id.*  The agreement did not contain an anti-reliance clause. *Id.*
[84] 2012 WL 2106945, at *8.
[85] *Id.*
[86] 2014 WL 1678419, at *1–2.

fraud that occurred *prior* to entering into the contract that induced the plaintiff into signing it.[87]

The instant case is distinguishable from the foregoing cases because Count II of ITW's Complaint relates to misrepresentations about the Financial Statements occurring *before* the closing of the SPSA. The Delaware Court of Chancery confronted a similar situation to the present case, and concluded that simultaneous fraud and breach of contract claims were viable because the claims were based on the manipulation of financial statements *before* entering into a stock purchase agreement.[88] In *Osram Sylvania Inc. v. Townsend Ventures, LLC*, the plaintiff–buyer entered into a Stock Purchase Agreement ("SPA") with the defendants–sellers.[89] After the closing, the plaintiff–buyer discovered that the defendants–sellers allegedly manipulated the acquired companies' financial statements to induce the plaintiff–buyer to enter into the SPA.[90] The SPA represented and warranted that the financial statements were "correct and complete in all material respects . . . and fairly present[ed] the financial condition . . . of the Acquired Companies."[91] The plaintiff–buyer alleged that the information in the financial statements did not fairly present the financial condition of the acquired companies

---

[87] *Id.* at *8.
[88] 2013 WL 6199554, at *16–17.
[89] *Id.* at *1.
[90] *Id.* at *2.
[91] *Id.* at *3.

19

and violated GAAP.[92]  The Court of Chancery refused to dismiss the fraud claim as impermissible bootstrapping because the plaintiff–buyer "pointed to specific misrepresentations by [the defendants–sellers] including misrepresentations about the sales results and financial condition of the [acquired companies] made *before* the [e]xecution of the SPA."[93]

In *ABRY Partners V, L.P. v. F & W Acquisition LLC*, the parties entered into a Stock Purchase Agreement ("SPA") for the buyer's purchase of a portfolio company.[94] The SPA contained several representations and warranties about the company's financial statements.[95]  After the parties entered into the agreement, the buyer discovered that the financial statements prior to the agreement were fraudulently manipulated by the buyer.[96]  The Court of Chancery refused to dismiss the fraudulent inducement claim, finding that the "financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company."[97]

Similar to the allegations *Osram* and *ABRY Partners*, ITW alleges that AIP manipulated the Financial Statements by engaging in the alleged sham sales with

---

[92] *Id.* at *2.
[93] *Id.* at *16–17.
[94] *ABRY Partners*, 891 A.2d at 1034.
[95] *Id.* at 1034–35.
[96] *Id.* at 1038–40.
[97] *Id.* at 1051.

Ichor and PFT.[98]  Importantly, ITW alleges the sham sales occurred before

entering into the SPSA and were designed to induce ITW to enter into the SPSA.[99]

AIP warranted in Section 2.8(c) of the SPSA that all of the Financial Statements

conformed to GAAP and were presented fairly, in all material respects, and that

AIP had sufficient controls to ensure that the statements were accurate.[100]  If any of

AIP's representations and warranties were false, AIP and the other sellers agreed to

indemnify ITW for any resulting "losses."[101]  ITW alleges AIP knew that the

November 2011 sales were essential to ITW's desire to purchase Brooks.[102]

ITW has alleged sufficient facts from which it can be reasonably inferred

that AIP fraudulently induced ITW to enter into the SPSA by directing Brooks to

artificially inflate its November 2011 sales through a series of "sham sales" *before*

the SPSA was entered into.[103]  Count II for fraud in the inducement is not

impermissibly bootstrapped to Count III for breach of contract.  Therefore, the

Court will not dismiss Count II to the extent it alleges that AIP manipulated the

November 2011 financial statements *before* ITW entered into the SPSA and is

based on misrepresentations in the SPSA.

---

[98] Compl. ¶¶ 44–55.
[99] *Id.* ¶ 46.
[100] Defs.' Op. Br., Ex. 1 SPSA § 2.8.
[101] *Id.* § 8.2.
[102] Compl. ¶ 28.
[103] Additionally, because Count II alleges damages for rescission or rescissory damages, it is not barred as a "rehash" of the Complaint's breach of contract damages.

## 2. Fraud in the Inducement Based on Extra-Contractual Statements

AIP also argues that ITW's fraud claims are barred because the SPSA explicitly disclaims any reliance on extra-contractual representations. According to AIP, the anti-reliance clause prevents ITW from alleging a *prima facie* case of fraud because ITW cannot justifiably rely on statements that it warranted it would not rely on.

To establish a claim for fraud, a plaintiff must have acted in justifiable reliance on the representation.[104] Reliance is commonly disclaimed in agreements between sophisticated parties.[105] An anti-reliance clause must contain clear language "by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[106] The policy behind enforcing anti-reliance clauses "is that a party cannot promise . . . that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim."[107]

---

[104] *See, e.g.*, *ABRY Partners*, 891 A.2d at 1050.
[105] *See id.* at 1057–59 (explaining that anti-reliance clauses are enforceable in Delaware).
[106] *See id.* at 1059 (quoting *Kronenburg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).
[107] *See ABRY Partners*, 891 A.2d at 1057.

The parties here do not dispute that the SPSA specifically warrants that ITW will not rely on extra-contractual statements.[108] Section 4.8(ii) of the SPSA, entitled "**No Reliance**," provides:

> [ITW] is not relying (for purposes of entering into this Agreement or otherwise) upon any advice, counsel or representations (whether written or oral) of the Sellers' Representative, Parent, any Subsidiary of Parent or any Seller other than those representations expressly made hereunder . . . .

Section 10.12, entitled "**Entire Agreement**," provides in pertinent part:

> Each party hereto agrees that, except for the representations and warranties contained in this Agreement, none of Buyer, Parent, Parent [sic], any of Parent's Subsidiaries, the Sellers, nor any Seller makes any other representations or warranties, and each hereby disclaims any other representations or warranties made by itself or employees, agents, financial and legal advisors, or other representatives with respect to the execution and delivery of the Agreement.

The parties dispute whether the anti-reliance clause applies to effectively bar ITW from asserting a fraud claim based on statements made by Defendants to ITW outside the four corners of the SPSA.

At the outset, the Court notes that "Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreement of sophisticated parties."[109] In doing so, Delaware courts have upheld

---

[108] Pl.'s Ans. Br. at 21.
[109] *Cornell Glasgow*, 2012 WL 2106945, at *8 (quoting *Nacco Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35–36 (Del. Ch. 2009)).

23

the enforceability of anti-reliance clauses.[110]  In *RAA Management, LLC v. Savage Sports Holdings, Inc.*, the plaintiff based its fraud claim on alleged misrepresentations made during the due diligence process outside of the final written agreement.[111]  In response to the defendant's motion to dismiss, the plaintiff argued that the court should decline to enforce the anti-reliance clause on public policy grounds.[112]  The Delaware Supreme Court rejected the plaintiff's public policy argument, and held that such a fraud claim was barred by the non-reliance disclaimer in the agreement.[113]  Further, *RAA Management* explicitly reaffirmed *ABRY Partners* for the proposition that public policy favors the enforcement of contractually binding written disclaimers of reliance on representations outside of a final agreement of sale.[114]  In *RAA Management*, the Delaware Supreme Court explained that:

> [s]ophisticated parties may not reasonably rely upon representations outside of the contract, where the contract—like the [nondisclosure agreement] in this case—contains a provision explicitly disclaiming reliance upon such outside representations.  The *Abry Partners* court distinguished fraud claims based on representations made *outside* of a merger agreement—which *can* be disclaimed through non-reliance

---

[110] *See, e.g.*, *ABRY Partners*, 891 A.2d at 1057–58.

[111] *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 117 (Del. 2012).  Although *RAA Management* was decided under New York law, the Delaware Supreme Court conducted a thorough analysis of the dispute under Delaware law and specifically stated, "the results would be the same under Delaware law."  *Id.* at 118.

[112] *Id.* at 116.

[113] *Id.* at 117.

[114] *Id.* at 118–19.

language—with fraud claims based on "false representation[s] of fact made *within* the contract itself"—which cannot be disclaimed.[115]

*RAA Management* controls the instant dispute. In addition to allegations of fraud in the inducement based on the SPSA, ITW bases the other half of its fraud claim on misrepresentations during the course of negotiations before entering into the SPSA, *i.e.*, outside the four corners of the SPSA. Although ITW alleges Defendants made misrepresentations before the parties signed the final written SPSA, by signing the SPSA, ITW warranted that it was not relying on any such representations made outside the SPSA. Moreover, ITW warranted in the anti-reliance clause that it is "a sophisticated entity familiar with transactions similar to those contemplated by [the SPSA]."[116] *RAA Management* makes clear that the SPSA's anti-reliance clause is enforceable to bar ITW's claim for fraud based on extra-contractual statements.[117]

---

[115] *Id.* at 117.

[116] Defs.' Op. Br., Ex. 1 SPSA § 4.8(iv).

[117] Moreover, in *ABRY Partners* the Court of Chancery stated that when confronted with such an argument (as that asserted by ITW), public policy favors enforcement of the anti-reliance clause. *ABRY Partners*, 891 A.2d at 1058. As then-Vice Chancellor Strine noted:

> To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a 'Double Liar' scenario.

25

Therefore, Count II for fraud in the inducement must be dismissed to the extent that ITW alleges a claim of fraud based on any extra-contractual statements made by AIP because the anti-reliance clause bars ITW from relying on such statements. [118]

*Id.* Similarly, as then-Vice Chancellor Jacobs noted in *Great Lakes Chemical Corp. v. Pharmacia Corp.*, "[w]ere this Court to allow [the buyer] to disregard the clear terms of its disclaimers and to assert its claims of fraud, the carefully negotiated and crafted . . . Agreement between the parties would . . . not be worth the paper it is written on." *RAA Mgmt.*, 45 A.3d at 113 (quoting *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 556 (Del. Ch. 2001)).

[118] After briefing was completed, ITW submitted a letter to the Court discussing *TransDigm, Inc. v. Alcoa Global Fasteners, Inc.* in support of its argument that the anti-reliance clause does not apply because the anti-reliance clause in the SPSA did not disclaim fraud based on concealment of information. *See* Pl.'s Mar. 23, 2015 Letter to the Court (Trans. ID. 56954364). In *TransDigm*, the Delaware Court of Chancery declined to dismiss a claim for "fraudulent concealment" despite an anti-reliance clause disclaiming reliance on "fraudulent misrepresentations." *TransDigm, Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881, at *8 (Del. Ch. 2013). In reaching this decision, the Court of Chancery distinguished between fraud claims based on false *representations* and those based on *concealment*. *Id.* at *8–10. Here, ITW's claims are focused on AIP allegedly misrepresenting—not concealing—the financial condition of Brooks with respect to the November 2011 sales. *See, e.g.*, Compl. ¶ 28. Because the Court of Chancery's analysis in *TransDigm* focused on fraudulent concealment, the Court does not find it persuasive on the dispute at issue here. Moreover, the Delaware Supreme Court made clear in *RAA Management* that an anti-reliance clause bars a plaintiff from later claiming fraud based on statements made outside the agreement. *See RAA Mgmt.*, 45 A.3d at 117–19. Additionally, the U.S. District Court for the District of Delaware has cautioned that the *TransDigm* "exception" is limited:

> [the plaintiff] cannot circumvent *Abry*'s holding by arguing the Defendants neglected to inform [the plaintiff] that its representations were false. Every misrepresentation, to some extent, involves an omission of the truth, and [the plaintiff] cannot re-characterize every misrepresentation as an omission. Therefore, simply characterizing something as an "omission" does not render the anti-reliance provision a nullity.

*Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 61 F. Supp. 3d. 391, 400 (D. Del. 2014).

## B. The Individual Defendants

ITW alleges claims for fraud and fraudulent inducement against the Individual Defendants.[119] Not only does the Complaint fail to mention the Individual Defendants in Counts I and II, the Complaint fails to plead any fraud committed by Marvin, Bamatter, or Baroyan. The requirement that fraud be pleaded with particularity "serves to discourage the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude."[120]

ITW warranted in the SPSA that it had been given access to Brooks' books and records, facilities, officers, employees, and any other property or documents that ITW had requested to review.[121] ITW further warranted that its decision to purchase Brooks was not based on any forecast or any "assurance, guarantee, or representation whatsoever as to the expected or projected success" of Brooks.[122]

---

[119] ITW does not oppose Defendants' Motion to Dismiss Counts III through V against the Individual Defendants. Pl.'s Ans. Br. at 26 n.20. Therefore, the Court finds that Counts III through V are dismissed against the Individual Defendants. The fraud claims against the Individual Defendants cannot be dismissed based on the bootstrapping doctrine because ITW is no longer seeking simultaneous claims for breach of contract or indemnification against the Individual Defendants. However, the anti-reliance clause applies with equal force to the Individual Defendants because, as discussed, ITW could not rely on statements made by the Individual Defendants outside the SPSA. Thus, ITW could not have justifiably relied on any statements made by the Individual Defendants that were outside of the SPSA.

[120] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993).

[121] Defs.' Op. Br., Ex. 1 SPSA § 4.8.

[122] *Id.*

27

The crux of ITW's argument is that the Complaint adequately alleges claims for fraud against the Individual Defendants because the Individual Defendants allegedly knew that Section 2.8 of the SPSA regarding Brooks' November 2011 balance sheet was false or that the representations were made with reckless indifference to the truth. While Superior Court Civil Rule 9(b) provides that "knowledge . . . may be averred generally," "where pleading a claim of fraud . . . that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[123]

Here, the "something" that all the Individual Defendants allegedly knew was that the November 30, 2011 financial statement was false. The Complaint alleges the following facts to support this alleged knowledge:

> (1) the Individual Defendants were aware on November 10, 2011, that Brooks' November sales would reach only $13 million;[124]

> (2) Marvin knew ITW was worried about the November financial results;[125]

> (3) Marvin refused to allow ITW representatives to have a face-to-face meeting with Brooks' management on December 8, 2011, after ITW received the November financial statements.[126] Instead, Marvin

---

[123] *Metro Commc'n Corp. BVI v. Advanced MobileComm Techs., Inc.*, 854 A.2d 121, 147 (Del. Ch. 2004) (quoting *IOTEX Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. 1998)).
[124] Compl. ¶ 41.
[125] *Id.* ¶ 31.
[126] *Id.* ¶ 34.

would only permit Brooks' management to discuss the November results by telephone and Brooks' management would provide written answers to any questions submitted by ITW;[127]

(4) Baroyan pushed the Brooks' sales teams to "book the hell out of everything we possibly can over the next 10–15 days to ease any concern ITW is going to have once they see October data;"[128]

(5) Baroyan had daily contact with Brooks' CEO and CFO to monitor Brooks' progress toward the November $17 million sales goal and he directed Brooks to maximize November sales;[129] and

(6) on or about November, 11, 2011, Bamatter asked Brooks' CEO and CFO, in regards to the low October sales, "is there a story that is not scary?"[130]

None of the aforementioned facts give rise to a reasonable inference that the Individual Defendants knew about, or were recklessly indifferent to, any alleged misrepresentations or sham sales contained in the November 2011 financial statements. Where a plaintiff fails to allege facts that support an inference that individuals had knowledge of a fraudulent statement, its fraud claim against those individuals must be dismissed.[131]

---

[127] *Id.*

[128] *Id.* ¶ 43.

[129] *Id.* ¶ 44.

[130] Compl. ¶ 42.

[131] *Metro Commc'n*, 854 A.2d at 146–47 (dismissing fraud claims against individuals where pleadings did not support a reasonable inference that they had "actual knowledge" of facts that made report misleading); *Anvil Holding Corp. v. Iron Acquisition Co.*, 2013 WL 2249655, at *7 (Del. Ch. 2013) (denying a motion to dismiss fraud claims where it was "reasonably conceivable" that the individual defendants had knowledge of false statements made by the company).

Additionally, the Complaint does not sufficiently allege that the Individual Defendants participated in the fraud.[132] Paragraph 15 of the Complaint conclusorily states, "Defendants Marvin, Bamatter, and Baroyan were actively involved in the fraud and were aware of the relevant facts." Nowhere does ITW plead any additional facts to support this conclusory statement. To the contrary, ITW alleges any fraud was committed by Brooks' employees—not AIP.[133] Without more, such a conclusory statement is insufficient to support a reasonable inference that the Individual Defendants participated in the alleged fraud.[134]

ITW has failed to allege sufficient facts from which it can reasonably be inferred that the Individual Defendants participated in the alleged fraud or knew about, or were recklessly indifferent to, any alleged misrepresentations or sham

---

[132] Corporate executives can be individually liable for the torts they personally commit even if they were acting in their official capacity. *Duffield Assocs., Inc. v. Meridian Architects & Eng'rs, LLC*, 2010 WL 2802409, at *4 n.5 (Del. Super. 2010) ("[A] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he [is] *an actual participant* in the tort." (quoting *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) (emphasis added))). "This rule applies to claims of fraud." *Duffield*, 2010 WL 2802409, at *4.

[133] The Complaint identifies Brooks' management, Hale (CEO) and Somani (Vice President Global Account Management) as the employees who orchestrated the alleged sham sales to Ichor. Compl. ¶¶ 46–56.

[134] *Browne*, 583 A.2d at 953, 955 (explaining that Rule 9(b) requires the circumstances surrounding the fraud to be pleaded with particularity); *Metro Commc'n*, 854 A.2d at 147 (explaining that merely holding a managerial position in a company is not sufficient to show a manager had knowledge of any alleged fraud committed by the company).

sales contained in the November 2011 financial statements.[135] Consequently, the claims against the Individual Defendants must be dismissed.

## VI. CONCLUSION

For the foregoing reasons, AIP's Motion to Dismiss Count I (fraud) is **GRANTED;** AIP's Motion to Dismiss Count II (fraud in the inducement) is **GRANTED, in part,** and **DENIED, in part;** and the Individual Defendants' Motion to Dismiss all counts against them in the Complaint is **GRANTED.**

**IT IS SO ORDERED.**

_____
Jan R. Jurden, President Judge

---

[135] Because the Court finds that ITW has failed to plead fraud with the requisite particularity against the Individual Defendants, the Court will not address the issue of personal jurisdiction.