**RAA MANAGEMENT, LLC, Plaintiff Below, Appellant,**

v.

**SAVAGE SPORTS HOLDINGS, INC., Defendant Below, Appellee.**

**No. 577, 2011.**

Supreme Court of Delaware.

Submitted: March 28, 2012.
Decided: May 18, 2012.

---

19. 681 A.2d at 1018.

John C. Phillips, Jr., Esquire and Megan C. Haney, Esquire, Phillips, Goldman & Spence, P.A., Wilmington, Delaware, and Thomas M. Buchanan, Esquire (argued), Adam S. Nadelhaft, Esquire and Jacob R. Loshin, Esquire, Winston & Strawn LLP, Washington, D.C., for appellant.

A. Thompson Bayliss, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, John C. Ertman, Esquire (argued) and Christopher D. Hydak, Esquire, Ropes & Gray LLP, New York, New York, for appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice:

The plaintiff-appellant, RAA Management, LLC ("RAA") appeals from a final judgment of the Superior Court that dismissed RAA's Complaint, pursuant to Rule 12(b)(6) of the Rules of Civil Procedure. In the Fall of 2010, RAA was one of several potential bidders for the defendant-appellee, Savage Sports Holdings, Inc. ("Savage"), a privately-held sports equipment manufacturer. As a precondition to Savage providing RAA with the company's confidential offering memorandum and other confidential information regarding the company, RAA and Savage entered into a nondisclosure agreement ("NDA"). RAA terminated negotiations with Savage before the parties executed a final sale agreement.

RAA's Complaint alleges that Savage told RAA at the outset of their discussions that there were "no significant unrecorded liabilities or claims against Savage," but then during RAA's due diligence into Savage, Savage disclosed three such matters, which caused RAA to abandon negotiations for the transaction. The Complaint contends that had RAA known of those matters at the outset, it never would have proceeded to consider purchasing Savage. Therefore, according to RAA, Savage should be liable for the entirety of RAA's alleged $1.2 million in due diligence and negotiation costs. The Superior Court held otherwise, and dismissed RAA's Complaint.

On appeal, RAA has advanced several claims. First, RAA submits that the Superior Court erroneously read the non-reliance disclaimer language in the NDA to absolve Savage of fraud rather than unintentional inaccuracies. Second, and

alternatively, RAA contends that the Superior Court incorrectly allowed an ambiguous disclaimer in the NDA to absolve Savage of all liability for fraud. Third, RAA argues that the Superior Court incorrectly enforced the NDA to preclude RAA's fraud claims because Savage allegedly made misrepresentations "about material facts within the defendant's peculiar-knowledge." Finally, RAA argues that, to the extent that the NDA absolved Savage from fraudulent misrepresentations, the NDA is unenforceable for public policy reasons.

### Facts

Savage is a Delaware corporation with its principal place of business in Westfield, Massachusetts. Its primary operating subsidiary is one of the largest rifle manufacturers in the United States. RAA, a Delaware limited liability corporation based in Wilmington, Delaware, is an investment firm with $1.3 billion of capital under management.

RAA's Complaint alleges that in September 2010, Savage, through its advisor, Robert W. Baird & Company ("Baird"), contacted RAA about becoming a potential bidder to purchase Savage. Baird was conducting a private auction of Savage. Thereafter, RAA began exploring the possibility of purchasing Savage.

In order to obtain confidential documents and information from Savage, as part of its due diligence process, RAA entered into a NDA with Savage on September 17, 2010. Pursuant to the NDA, RAA agreed to keep confidential all information furnished by Savage "concerning the Company that is non-public, confidential or proprietary in nature[.]" In negotiating the terms of the NDA, the parties were each represented by experienced legal counsel.

In the NDA, RAA agreed that Savage was making no representations or warranties as to the accuracy or completeness of any information (the "Evaluation Material") being provided to RAA, and that Savage would have no liability to RAA resulting from RAA's reliance on such information, except for breaches of representations and warranties that Savage was to later make in an executed "Sale Agreement." Paragraph 7 of the NDA states:

> You [RAA] understand and acknowledge that neither the Company [Savage] nor any Company Representative is making **any** representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material or of **any** other information concerning the Company provided or prepared by or for the Company, and none of the Company nor the Company Representatives, will have **any** liability to you or any other person resulting from your use of the Evaluation Material or any such other information. **Only** those representations or warranties that are made to a purchaser in the Sale Agreement when, as and if it is executed, and subject to such limitations and restrictions as may be specified [in] such a Sale Agreement, shall have any legal effect.[1]

In the NDA, RAA also waived any claims it might have in connection with any potential transaction with Savage unless the parties entered into a definitive sale agreement. Paragraph 8 of the NDA provides:

> You [RAA] understand and agree that no contract or agreement providing for a transaction between you and the Company [Savage] shall be deemed to exist between you and the Company unless

---

1. Emphasis added.

and until a definitive Sale Agreement has been executed and delivered, and you hereby waive, in advance, **any** claims ... in connection with any such transaction unless and until you shall have entered into a definitive Sale Agreement." [2]

After undertaking some preliminary due diligence, RAA expressed an interest in purchasing Savage. RAA submitted a Letter of Intent ("LOI") to Savage, which stated that RAA's "principals have extensive investing and operational experience having participated in traditional asset and stock deals as well as special situation transactions." The LOI set out the terms on which RAA might purchase all outstanding shares of Savage in exchange for a cash payment of $170 million. In the LOI, Savage agreed to negotiate solely with RAA for a period of 45 days. The parties executed the LOI on December 22, 2010.

RAA engaged in further due diligence during January and February 2011. In March 2011, RAA notified Savage that it was no longer interested in acquiring Savage and demanded payment from Savage for its "sunken due diligence costs" of $1.2 million. Savage rejected RAA's demand.

### RAA's Complaint

RAA initiated this lawsuit in April 2011. In its Complaint, RAA contends that Savage committed fraud by "misrepresent[ing] to and conceal[ing] from RAA" the existence of three alleged "material unrecorded liabilities and claims against it." According to RAA, any one of those three liabilities would have caused RAA to have never attempted to acquire Savage.

The first alleged material liability was an investigation by the New York State Department of Environmental Conserva-

tion. RAA contends that Savage failed to disclose the existence of an ongoing investigation by the New York State Department of Environmental Conservation into the activities of a predecessor company of Savage at the Canal–Frankfort State Superfund site. According to RAA, Savage specifically misrepresented the existence of this investigation in a document (attached as Exhibit B to the Complaint) Savage provided in the on-line data room, which states that Savage "has no potential Superfund liabilities." RAA claims that it "would not have even pursued due diligence" had it known about this investigation from the inception of its expressed interest in Savage.

The second alleged material liability was the potential unionization of the employees at Savage's BowTech facility. RAA contends that in February 2011, in the course of negotiations and due diligence, Savage promptly notified RAA that it had received a notice from the National Labor Relations Board ("NLRB") that a minority of employees at a plant in Oregon, operated by Savage's subsidiary BowTech, had petitioned the NLRB to allow an employee vote at the plant for unionization. RAA, however, alleges that "[o]n several occasions in 2011, Savage and its representatives advised RAA and its representatives that there were no unionization efforts at [Savage's] BowTech Plant in Eugene, Oregon, even though Savage knew for months that there were ongoing efforts to unionize the BowTech Plant."

The third alleged material liability was a "multi-million dollar" BowTech lawsuit. The RAA Complaint asserts that when asked whether there was any litigation or potential litigation against the company, Savage "advised RAA of various lawsuits, and ultimately advised it of a $40 million

**2.** Emphasis added.

patent and contract lawsuit against Bow-Tech that was filed on February 18, 2011." RAA alleges that "Savage was aware of the potential for a lawsuit against Bow-Tech since April 2010, long before it disclosed it to RAA."

### Superior Court Decision

Savage filed a motion to dismiss RAA's Complaint pursuant to Rules 12(b)(6) and 9(b) of the Superior Court Rules of Civil Procedure. For the purposes of deciding Savage's motion, the Superior Court accepted as true the allegations of fact in RAA's Complaint. Nevertheless, the Superior Court granted Savage's motion to dismiss.

The Superior Court held that two separate provisions in the NDA "unambiguous[ly]" bar liability for fraudulent misrepresentations. First, the Superior Court determined that in Paragraph 7 of the NDA (the "non-reliance disclaimer"), RAA expressly disclaimed reliance on the accuracy or completeness of any information provided to RAA in the course of due diligence. RAA also agreed that any claim based on due diligence information would be limited to a claim arising out of a completed transaction, based on the representations and warranties Savage would make in a final, definitive sale agreement. Second, the Superior Court relied "to a lesser extent" on Paragraph 8 of the NDA, in which RAA expressly waived bringing any claim relating to a transaction between the parties, except claims based on a completed transaction where the parties had entered into a binding, final sale agreement. The Superior Court concluded that the NDA disclaimers and waiver were "unambiguous" and "absolve[d] the seller

[Savage] from intentional fraud." In its bench ruling, the Superior Court stated:

> [W]here a sophisticated investor like RAA Management agrees to perform due diligence with the understanding that the seller disclaims any warranty of accuracy or completeness in the information it provides to the potential buyer, the due diligence is governed by . . . a buyer beware notion, that even absolves the seller from intentional fraud.

The Superior Court also ruled that the "peculiar-knowledge" exception to fraud disclaimers recognized under New York law did not apply. Accordingly, it dismissed RAA's Complaint with prejudice.

The Superior Court did not explicitly decide whether Delaware or New York law applies. Savage argues that Delaware law governs RAA's fraud claim, since Delaware courts apply the law of the state with the "most significant relationship to the occurrence and the parties" to fraud claims.[3] RAA argues that the NDA's New York choice of law provision compels the application of New York law. In this appeal, we assume that New York law applies, but conclude that the outcome would be the same under Delaware law.

### NDA Unambiguous

In this appeal, RAA first argues that the "most reasonabl[e]" interpretation of the language in the NDA is to limit RAA's non-reliance disclaimer to barring claims based on "mistakes or unintentional oversights" or "negligent failures to disclose," but "not willful falsehoods." Conversely, Savage argues that the plain text of Paragraph 7 bars RAA from asserting claims based on alleged inaccuracies or incompleteness in *anything* said to RAA in the course of due diligence, regardless of Sav-

**3.** *See Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC,* 832 A.2d 116, 124 (Del.Ch. 2003).

age's "intent" in conveying the information.

██ In Paragraph 7 of the NDA, RAA acknowledged and agreed that Savage was making no representations or warranties as to the accuracy or completeness of due diligence information, and that Savage would have no liability to RAA for RAA's use of "any such other information," save for representations and warranties made by Savage in a final definitive "Sale Agreement." The language in Paragraph 7 does not distinguish between due diligence information that is inaccurate or incomplete because of Savage's negligence or mistake, and due diligence information claimed to be "fraudulently" or "intentionally" inaccurate or incomplete. Therefore, we conclude RAA's argument—that the language of the disclaimers in Paragraph 7 of the NDA should be construed as providing an exception for "intentional" or "fraudulent" misrepresentations—has no basis in the NDA and thus lacks merit.[4]

Second, and alternatively, RAA argues that if the actual disclaimer language in Paragraph 7 of the NDA cannot be read as providing an express exception for inaccurate or incomplete information attributable to fraud, that language is "at least ambiguous" as to whether the NDA creates such an exception. In two prior cases, the Court of Chancery interpreted and enforced NDA provisions with disclaimers that are virtually identical to those at issue in the present case.[5] In both cases, the Court of Chancery found the disclaimer language at issue to be unambiguous under both New York and Delaware law.

In *Great Lakes Chemical Corp. v. Pharmacia Corp.,* the Court of Chancery held that several clauses in a purchase agreement between two sophisticated corporations precluded the buyer from asserting any fraud claims against the seller under Delaware law.[6] Two of those clauses contained almost the same language as the NDA at issue in this appeal. The clauses in *Great Lakes* disclaimed liability resulting from the use of "any information, document, or material made available to the Buyer in certain 'data rooms' " and any "representation or warranty as to *the accuracy or completeness* of the information ... made available in connection with any further investigation of the Company."[7]

In *Great Lakes,* the Court of Chancery held that the buyer could not have justifiably relied on any representations made by the seller during the due diligence process, because the record reflected that "two highly sophisticated parties, assisted by industry consultants and experienced legal counsel, entered into carefully negotiated disclaimer language after months of extensive due diligence."[8] As then Vice Chancellor (now Justice) Jacobs explained:

> Were this Court to allow [the buyer] to disregard the clear terms of its disclaimers and to assert its claims of fraud, the carefully negotiated and crafted Purchase Agreement between the parties would ... not be worth the paper it is written on. To allow [the buyer] to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial

---

4. *Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 746 (Del.1997) ("Contract interpretation that adds a limitation not found in the plain language untenable").

5. *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544 (Del.Ch.2001); *In re IBP, Inc. S'holders Litig.,* 789 A.2d 14 (Del.Ch.2001).

6. *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d at 551–56.

7. *Id.* at 552 (emphasis added).

8. *Id.* at 555.

expectations of the contracting parties and eviscerate the utility of written contractual agreements.[9]

Accordingly, in *Great Lakes,* the Court of Chancery held that "the parties' contractually agreed-to disclaimers extinguish the fraud claims being asserted [by the buyer]."[10]

In *In re IBP, Inc. Shareholders Litigation,* the Court of Chancery held that language nearly identical to the disclaimer in the NDA applied to fraud claims and barred liability for fraudulent misrepresentations under New York law.[11] In that case, an acquiring corporation ("Tyson") sought to rescind the merger agreement between itself and the acquired corporation ("IBP"), on the grounds that IBP fraudulently induced the merger through misrepresentations and omissions made during the due diligence process.[12] The Court of Chancery rejected Tyson's fraud claim, in part because of a non-reliance clause in the parties' Confidentiality Agreement entered into at the beginning of the parties due diligence/negotiation process:

> We [Tyson] understand and agree that none of the Company, its advisors or any of their ... representatives (i) have made or make **any** representation or warranty, express or implied, as to the **accuracy or completeness** of the Evaluation Material or (ii) shall have **any** liability whatsoever to us or our Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom,

except in the case of (i) and (ii), to the extent provided in any definitive agreement relating to a Transaction.[13]

In analyzing the foregoing provision, the Court of Chancery held:

> The intent of the Confidentiality Agreement is clear: it was designed to require Tyson to waive any deficiencies in due diligence as a basis for suit, unless that deficiency constituted a breach of representation or warranty in the resulting merger agreement.[14]

Then Vice Chancellor (now Chancellor) Strine determined that the quoted language in the Confidentiality Agreement "emphasize[d] to an objective reader that the **merger negotiation process** would not be one during which Tyson could reasonably rely on oral assurances. Instead, if Tyson wished to protect itself, it would have to ensure that any oral promises were converted into contractual representations and warranties."[15] In applying New York law, the Court of Chancery held that the disclaimer language in the Confidentiality Agreement was unambiguous and stated:

> [The Confidentiality Agreement] contributes to the caution with which Tyson should have taken any oral assurances or representations from IBP during the Merger negotiation process. Tyson had agreed that it could not use any oral or written due diligence information *(or omissions therefrom)* as a basis for a lawsuit unless that issue was covered by

---

9. *Id.* at 556.

10. *Id.* at 556. The fraud claims barred by the disclaimers in *Great Lakes* included a claim that the seller lied during due diligence discussions about the target company's current sales performance. *See id.* at 551, 554.

11. *In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 72–73 (Del.Ch.2001).

12. *Id.* at 72.

13. *Id.* at 32 (emphasis added).

14. *Id.* at 73 n. 179.

15. *Id.* at 32 (emphasis added).

a specific provision of a subsequent, written contract. As a result, Tyson could not have assumed that it could place reasonable reliance on assurances of IBP that were not reduced to a specific written promise in the Merger Agreement.[16]

In this case, as in *In re IBP* and *Great Lakes*, RAA contractually agreed in the NDA that Savage was not making any representations as to the "accuracy or completeness" of materials and information it provided during diligence; that Savage would not have any liability by reason of RAA's use of and reliance on the diligence materials; and that the only representations or warranties on which RAA could rely were those contained in a final, definitive executed sale agreement. Nevertheless, RAA asserts that, because the NDA "fails to disclaim liability for fraudulent statements *specifically*, even if its general language may do so by implication[,]" the NDA does not operate to preclude claims of fraud under New York law.

The Court of Chancery rejected that argument in *Great Lakes* and *In re IBP*, finding that contractual provisions nearly identical to those in the NDA here were specific enough to bar fraud claims under New York and Delaware law.[17] Indeed, the *In re IBP* court rejected the same argument that RAA makes in this appeal:

> Tyson [the acquiring corporation] tries to compare the Confidentiality Agreement's liability limitation to a boilerplate integration clause. But the Confidentiality Agreement is a short and important contract knowingly entered into by Tyson to govern its relationship with IBP [the acquired corporation]. Tyson thus seeks to have this court relieve it of a risk that it assumed with full knowledge and to deprive IBP of its legitimate contractual expectations. Under New York or Delaware law, the Confidentiality Agreement is a clear and enforceable contract that precludes Tyson's plea to be excused from its own commitment.[18]

We agree. Under Paragraphs 7 and 8 of the NDA, RAA acknowledged that in the event no final "Sale Agreement" on a transaction was reached, Savage would have no liability, and could not be sued, for *any* allegedly inaccurate or incomplete information provided by Savage to RAA during the due diligence process.

### *"Peculiar–Knowledge" Exception Inapplicable*

RAA next argues that the Superior Court should have declined to enforce the NDA under New York's "peculiar-knowledge" exception. Some New York courts have held, in the context of completed sales transactions, that claims of fraudulent inducement due to statements made by the seller would not be barred by the non-reliance provisions at issue in those specific cases, if the facts at issue were "peculiarly within the misrepresenting party's knowledge."[19]

█ Savage points out, however, that the peculiar-knowledge exception has been rejected by courts in circumstances where sophisticated parties could have easily insisted on contractual protections for them-

---

16. *Id.* at 73 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 599 (1959) and other New York cases).

17. *See Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d at 555–56; *In re IBP, Inc. S'holders Litig.*, 789 A.2d at 32, 72–74.

18. *In re IBP, Inc. S'holders Litig.*, 789 A.2d at 73 n. 180.

19. *See, e.g., Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir.1998).

selves.[20] Savage argues that "[f]rom the perspective of the efficient functioning of the M & A markets, a key component of the U.S. economy, the overriding policy consideration in the present circumstances is the enforcement of the parties' pre-negotiation agreement to bar litigation if negotiations failed." According to Savage, applying the peculiar-knowledge exception to "the present circumstances—a walk-away bidder claiming it had been provided inaccurate or incomplete due diligence information—would mean that sophisticated parties could never have an enforceable agreement that a bidder would not bring due diligence claims if it walked away from negotiations." We agree.

 This case involves two sophisticated parties who agreed—in advance in their NDA—that the bidder could not rely on the accuracy or completeness of *any* information provided during the due diligence process, and could not sue the seller based on claims arising from representations during the due diligence process, if negotiations broke down and no final sale agreement was ever executed. RAA could have negotiated to include a representation by Savage in the NDA that its due diligence disclosures were accurate and complete. That was not done. Therefore, RAA cannot now rely upon the peculiar-knowledge exception to support its claims.[21]

### Policy Considerations

Finally, RAA argues that this Court should decline to enforce the agreed-upon language of the non-reliance clauses in the NDA on policy grounds.[22] RAA submits that the "the general rule prohibits parties from using contracts to shield themselves from liability for their own fraud...." In response, Savage argues that the only case that RAA cites in support of its assertion that public policy considerations weigh in its favor, *Abry Partners V, L.P. v. F & W Acquisition LLC,*[23] actually supports the Superior Court's dismissal of RAA's Complaint.

In *Abry Partners*, the Court of Chancery explained Delaware's public policy in favor of enforcing contractually binding, written disclaimers of reliance on repre-

---

**20.** *See id.; see also Psenicska v. Twentieth Century Fox Film Corp.,* 409 Fed.Appx. 368, 371 (2d Cir.2009) (granting Rule 12(b)(6) motion and finding that the "peculiar knowledge" exception was inapplicable). The "peculiar-knowledge" exception is meant to "address circumstances where a party would face high costs in determining the truth or falsity of an oral representation" and does not apply where a party "could have insisted that the written contract terms reflect any oral undertaking on a deal-breaking issue." *Id.* (quoting *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 149 F.3d at 136).

**21.** *See Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 149 F.3d at 136–37; *Bibeault v. Advanced Health Corp.,* 2002 WL 24305, at *5 (S.D.N.Y. Jan. 8, 2002). The peculiar-knowledge exception does not apply where the plaintiff had a low cost alternative such as "insisting] that the written contract terms reflect any oral undertaking on a deal-breaking issue." *Bibeault v. Advanced Health Corp.,* 2002 WL 24305, at *5 (quoting *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 149 F.3d at 136).

**22.** Although an agreement of sale was never executed in this case, the following articles provide thoughtful examinations of non-reliance clauses. Allen Blair, *A Matter of Trust: Should No–Reliance Clauses Bar Claims for Fraudulent Inducement of Contract?* 92 Marq. L.Rev. 423 (2009); Jeffrey M. Lipshaw, *Of Fine Lines, Blunt Instruments, and Half–Truths: Business Acquisition Agreements and the Right to Lie,* 32 Del. J. Corp. L. 431 (2007).

**23.** *Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032 (Del.Ch.2006).

sentations outside of a final sale agreement:

> The teaching of this court, through cases such as *Great Lakes[,] H–M Wexford [LLC v. Encorp, Inc.*, 832 A.2d 129 (2003) ] *Progressive,* and *Kronenberg [v. Katz,* 872 A.2d 568 (2004) ] is that a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a "but we did not rely on those representations" fraudulent inducement claim. The policy basis for this line of cases is, in my view, quite strong. If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact. Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.

> To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of

commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.[24]

In *Abry Partners,* the Court of Chancery held that sophisticated parties may not reasonably rely upon representations outside of the contract, where the contract— like the NDA in this case—contains a provision explicitly disclaiming reliance upon such outside representations.[25] The *Abry Partners* court distinguished fraud claims based on representations made *outside* of a merger agreement—which *can* be disclaimed through non-reliance language— with fraud claims based on "false representation[s] of fact made *within* the contract itself"—which cannot be disclaimed.[26]

■ RAA bases its fraud claim on misrepresentations allegedly made by Savage in the due diligence process outside of a final written agreement. In accordance with the *ratio decidendi* of *Abry Partners,* RAA's claim must be barred by the non-reliance disclaimer and waiver provisions in the NDA. In applying New York law, federal courts have also recognized the same policy reasons for enforcing non-reliance disclaimers that were stated in *Abry Partners.*

In *Warner Theatre Associates Ltd. Partnership v. Metropolitan Life Insurance Co.,*[27] the plaintiff alleged that it was fraudulently induced to enter into a negotiation agreement to pay the defendant

24. *Id.* at 1057–58 (footnote omitted).

25. *Id.* at 1057–59.

26. *See id.* at 1059 (emphasis added) (comprehensive non-reliance clauses will enable parties "to escape responsibility for their own fraudulent representations made outside of the agreement's four corners[,]" but will not

permit a contracting party to avoid a rescission or damages claim "based on a false representation of fact made within the contract itself").

27. *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 1997 WL 685334 (S.D.N.Y. Nov. 4, 1997), *aff'd* 149 F.3d 134 (2d Cir.1998).

lender a $600,000 fee in return for the defendant's reconsideration and renegotiation of a $120 million loan.[28] Initially, the defendant verbally assured the plaintiff that a "workable solution would be found" concerning certain financing terms, but the written agreement explicitly stated that the parties had not "agreed upon any of the basic terms of any proposed mortgage loan...."[29] Then District Court Judge (now Supreme Court Justice) Sonia Sotomayor granted the defendant's motion to dismiss, and explained:

> The Second Circuit, in discussing the rationale underlying *Danann,* has emphasized the principle that where parties, particularly sophisticated ones ..., have undertaken certain obligations—and at the same time expressly limited those obligations—the courts should not normally interfere with those choices. *Danann* therefore stands for the principle that where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship.... [The plaintiff] having chosen to disclaim reliance with a term explicitly included in the contract, the Court will not interfere with its choice. As the *Danann* court succinctly stated, [i]f the plaintiff has made a bad bargain, he cannot avoid it in this manner.[30]

In affirming Justice Sotomayor's decision in *Warner Theatre,* the Second Circuit recognized that allowing a fraud claim to progress to a trial where the parties had previously agreed to a non-reliance disclaimer, "might greatly lessen the useful role disclaimers play in negotiation agreements":

> A party's use of ... **disclaimers in negotiation agreements is intended not only to avoid liability if the negotiations fail but also to avoid lawsuits, or at least lawsuits that cannot be quickly dismissed.** The rule [the plaintiff] presses would essentially negate such disclaimers by allowing naked allegations of prior oral assurances to trump at the pleading and summary judgment stage even the most explicit disclaimer in a negotiation agreement. The disclaiming party would always be forced to settle or go to trial, and perhaps lose on, every fraudulent-inducement claim supported by the bare allegation that it orally misrepresented its intent regarding a term of a loan. The absence of any means to avoid such costly litigation might well deter some lenders from entering into negotiation agreements and cause fewer loans to be negotiated.[31]

The holdings and the policy rationales in both *Warner Theatre* decisions are equally applicable to RAA's claims against Savage in the present case.

Although we have decided this matter under New York law, the results would be the same under Delaware law. Under the facts alleged in RAA's Complaint, this Court's holding in *Norton v. Poplos*[32] is distinguishable for the reasons that were stated in *Great Lakes.*[33] *Abry Partners*

---

28. *Id.* at *1.

29. *Id.* at *2–3.

30. *Id.* at *5 (internal citations and quotation marks omitted).

31. *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 149 F.3d at 137 (emphasis added).

32. *Norton v. Poplos,* 443 A.2d 1 (Del.1982).

33. *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 555 (Del.Ch.2001).

accurately states Delaware law and explains Delaware's public policy in favor of enforcing contractually binding written disclaimers of reliance on representations outside of a final agreement of sale or merger.

Before parties execute an agreement of sale or merger, the potential acquirer engages in due diligence and there are usually extensive precontractual negotiations between the parties. The purpose of a confidentiality agreement is to promote and to facilitate such precontractual negotiations. Non-reliance clauses in a confidentiality agreement are intended to limit or eliminate liability for misrepresentations during the due diligence process. The breadth and scope of the non-reliance clauses in a confidentiality agreement are defined by the parties to such preliminary contracts themselves.[34] In this case, RAA and Savage did that, clearly and unambiguously, in the NDA.

Savage agreed to provide confidential information to RAA, on the condition that RAA enter into the NDA, which included Paragraph 7's non-reliance provisions for information provided during the due diligence process. In the *Great Lakes* and *In re IBP* opinions, non-reliance clauses that mirrored the language of Paragraph 7 in the NDA were held to be broad enough to preclude claims for fraud. Accordingly, when Savage and RAA entered into the

NDA, both parties knew how the non-reliance clauses had been construed by Delaware courts.

The efficient operation of capital markets is dependent upon the uniform interpretation and application of the same language in contracts or other documents.[35] The non-reliance and waiver clauses in the NDA preclude the fraud claims asserted by RAA against Savage. Under New York and Delaware law, the reasonable commercial expectations of the parties, as set forth in the non-reliance disclaimer clauses in Paragraph 7 and the waiver provisions in Paragraph 8 of the NDA, must be enforced. Accordingly, the Superior Court properly granted Savage's motion to dismiss RAA's Complaint.

### *Conclusion*

The judgment of the Superior Court is affirmed.

---

**34.** *See* Steven M. Haas, *Contracting Around Fraud Under Delaware Law*, 10 Del. L.Rev. 49 (2008). *See also* the Model Confidentiality Agreement in ABA Mergers & Acqs. Comm., *Model Merger Agreement for the Acquisition of a Public Company* (2011).

**35.** *Bank of N.Y. Mellon Trust Co. v. Liberty Media Corp.*, 29 A.3d 225, 242 (Del.2011); *Airgas, Inc. v. Air Prods. & Chems.*, 8 A.3d 1182, 1191 (Del.2010).