# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INFOMEDIA GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. N19C-10-212 AML CCLD |
| ORANGE HEALTH SOLUTIONS, | ) | |
| INC. and GREAT POINT | ) | |
| PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: April 23, 2020
Decided: July 31, 2020

## MEMORANDUM OPINION

### Upon Defendants' Motions to Dismiss: GRANTED

Daniel J. Brown, Esquire, Hayley J. Reese, Esquire, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff Infomedia Group, Inc.*

Daniel B. Rath, Esquire, Rebecca L. Butcher, Esquire, Nicolas E. Jenner, Esquire, LANDIS RATH & COBB LLP, Wilmington, Delaware and Alan S. Wachs, Esquire, SMITH, GAMBRELL & RUSSELL, LLP, Jacksonville, Florida; *Attorneys for Defendants Orange Health Solutions, Inc.*

Daniel B. Rath, Esquire, Rebecca L. Butcher, Esquire, Nicolas E. Jenner, Esquire, LANDIS RATH & COBB LLP, Wilmington, Delaware and Donald H. Chase, Esquire of MORRISON COHEN LLP, New York, New York; *Attorneys for Great Point Partners, LLC.*

**LEGROW, J.**

The buyer under an asset purchase agreement purchased the seller's rights and obligations under a series of service contracts. The buyer now contends the seller fraudulently and negligently represented during the parties' negotiations that the seller had not received notice of any customer's intent to terminate the service contracts. This representation, the buyer contends, was false or misleading because several days before the parties executed their agreement, the seller received oral notice that one of its customers intended to terminate several contracts. The representations that form the basis of the buyer's claims, however, were not contained in the asset purchase agreement the parties signed, and the buyer expressly represented in that agreement that it was not relying on any extra-contractual representations.

The issue in this case is whether the buyer can maintain tort claims based on extra-contractual representations in the face of unambiguous contractual language in which the seller expressly disclaimed making any such representations and the buyer expressly warranted that it was not relying on any such representations. The buyer employs various tactics to try to plead around the contractual anti-reliance clause, arguing that the buyer is relying on extra-contractual "omissions" rather than overt representations, and that Delaware law permits it to maintain a claim for fraudulent concealment notwithstanding the contractual language. None of these arguments is persuasive or allows the buyer to escape the contractual limitations to which it

expressly agreed. Delaware law enforces sophisticated parties' agreements to limit their reliance to contractual representations. Because the buyer cannot plead justifiable reliance, its claims must be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the complaint and the documents it incorporates. On July 1, 2019, plaintiff Infomedia Group, Inc., d/b/a Carenet Health Services ("Carenet" or "Plaintiff") entered into an asset purchase agreement (the "Purchase Agreement") with defendant Orange Health Solutions, Inc. (hereinafter, "Citra"). Carenet and Citra are healthcare companies that provide various services to clients in the healthcare field. Before the parties entered into the Purchase Agreement, one of the services Citra provided its clients was a Nurse Advice Line. Under the Purchase Agreement, Carenet purchased Citra's rights and obligations under those Nurse Advice Line contracts (the "Contracts").

The parties began discussing the potential asset purchase in August 2018, when defendant Great Point Partners, LLC "(Great Point," and collectively with Citra, "Defendants") advised Carenet that Citra was exploring selling its rights and obligations under the Contracts. Great Point allegedly owns or controls Citra, and Great Point participated in the parties' negotiations and discussions. During due diligence, Carenet expressly inquired whether any of Citra's customers had

2

expressed an intent to amend, modify, or terminate any of the Contracts and whether there was a risk of such termination as a result of the proposed transaction. Great Point and Citra assured Carenet that there was minimal risk that any of Citra's customers would terminate the Contracts. Defendants also orally represented to Carenet on "numerous occasions [before] the execution of any agreement that [Defendants] were not aware of any customer that intended to terminate any of the Contracts."[1]

Humana was one of Citra's top customers and the source of several of the Contracts. On June 21, 2019, approximately two weeks before the Purchase Agreement was signed, Humana and Citra participated in a phone call during which Citra learned that Humana intended to terminate the majority of its nurse advice line contracts. Humana advised Citra that written notice of the termination would follow. Although Great Point also was aware of Humana's orally stated intent to terminate, neither defendant advised Carenet of the conversation. To the contrary, Citra instructed its employees not to disclose Humana's intent to anyone. Carenet alleges Defendants intentionally concealed Humana's intent to terminate, and Carenet would not have entered into the Purchase Agreement if it was aware of Humana's plans.

---

[1] Compl. ¶ 23.

3

The parties executed the Purchase Agreement on July 1, 2019, and the transaction closed that day. In the Purchase Agreement, Citra expressly represented that it had not received *written* notice from any customer of an intent to terminate the Contracts, specifically:

> Neither [Citra], or to the knowledge of [Citra], any other party thereto, (i) is in material breach of or material default under any Contract, or (ii) except as set forth on Section 2.4(d) of the Seller Disclosure Schedule, has provided or received any written notice of any material breach or alleged material breach of, audit of, or intention to terminate, amend, or modify (including any material change in anticipated call volume), any Contract.[2]

After the transaction closed, Carenet discovered that Humana intended to terminate the Contracts to which it was a party. Carenet then filed this action against Citra and Great Point, alleging claims for fraudulent inducement and negligent misrepresentation. Carenet seeks compensatory and punitive damages, as well as interest and attorneys' fees. Defendants have moved to dismiss all the claims. This is the Court's decision after considering the briefs and the parties' arguments.

## ANALYSIS

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give

---

[2] Def. Orange Health Sols., Inc.'s Opening Br. in Supp. of its Mot. to Dismiss (hereinafter "Orange Health's Mot. to Dismiss"), Ex. A Purchase Agreement (hereinafter "Purchase Agreement") § 2.4(d). Although the Purchase Agreement was not attached to the complaint, the parties conceded the Court may consider it because it was incorporated by reference in the Complaint. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 817-18 (Del. 2013).

4

the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[3] The Court, however, must "ignore conclusory allegations that lack specific supporting factual allegations."[4] Moreover, when a complaint pleads claims of fraud or negligence, Superior Court Civil Rule 9(b) imposes a heightened pleading standard.[5] To plead fraud or negligence claims, a plaintiff must allege with particularity the circumstances constituting the fraud or negligence.[6] Allegations of malice, intent, or knowledge may be averred generally.[7]

Carenet has not filed a breach of contract claim based on Citra's contractual representation that it had not received written notice that any customer intended to terminate the Contracts. Instead, Carenet contends Citra's representations before the Purchase Agreement was signed negligently or fraudulently were made. In support of their motions to dismiss, Defendants argue Carenet's fraud and negligent misrepresentation claims are barred by several clauses in the Purchase Agreement in which Carenet disclaimed reliance on any extra-contractual representations. Defendants further argue that Carenet also cannot plead that Defendants'

---

[3] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[4] *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998).
[5] *Avve, Inc. v. Upstack Techs., Inc.*, 2019 WL 1643752, at *5 (Del. Super. Apr. 12, 2019).
[6] Super. Ct. Civ. R. 9(b).
[7] *Id.*

representations regarding oral notice of termination were material, since Carenet agreed to a contractual representation that was limited to whether Defendants had received written notice of termination. For the reasons set forth below, both those arguments independently support dismissal of the complaint with prejudice.[8]

## A. Carenet's fraud and negligent misrepresentation claims are barred by the Purchase Agreement's anti-reliance and related provisions.

Defendants first argue that the Purchase Agreement's anti-reliance provisions bar any claim for fraud or negligent misrepresentation, since both causes of action require the claimant to show that it justifiably relied on the representation.[9] A claim for fraud consists of: (i) a false representation, usually one of fact, made by a defendant; (ii) the defendant knowing or believing the representation was false, or making it with reckless indifference to the truth; (iii) an intent to induce the plaintiff to act or refrain from acting; (iv) the plaintiff acting or refraining from acting in justifiable reliance on the representation; and (v) damage resulting from such reliance.[10] A claim for negligent misrepresentation is similar, except a claimant need

---

[8] Defendants, individually or jointly, raise a number of other arguments, including that Carenet has not plead fraud with the requisite particularity, has not alleged the existence of a special relationship supporting a negligent misrepresentation claim, and cannot maintain a claim for attorneys' fees or damages above the contractual limit. Because the arguments addressed above support dismissal of the entire complaint with prejudice, these alternative arguments are moot and are not addressed herein.

[9] *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.*, 2002 WL 1558382, at *6 (Del. Ch. July 9, 2002).

[10] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

not prove that the defendant made the misrepresentation knowingly or recklessly.[11] Instead, the plaintiff must establish that the defendant owed the plaintiff a duty to provide accurate information.[12]

## 1. Defendants cannot state a claim for fraudulent inducement or negligent misrepresentation based on extra-contractual representations.

Defendants argue that Carenet's claims are predicated on representations that Defendants allegedly made during the parties' negotiations and the due diligence leading up to the Purchase Agreement. A fraud or misrepresentation claim based on those extra-contractual representations, Defendants contend, specifically is barred by the language in the Purchase Agreement in which Carenet agreed it was not relying on such representations and in which Citra disclaimed making any such representations.

There are several clauses in the Purchase Agreement that Defendants assert preclude Carenet from alleging it relied on any representations other than those found in the Purchase Agreement. First, as set forth above, Citra represented in Section 2.4(d) that it had not received and was not aware of "any written notice of any . . . intention to terminate, amend, or modify . . . any Contract." Second, Citra

---

[11] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015).

[12] *Id.*; *Sanders v. Devine*, 1997 WL 599539, at *6-7 (Del. Ch. Sept. 24, 1997).

specifically stated that it was not making any representations or warranties other than those contained in the Purchase Agreement. Specifically, Section 2.9 provides:

> Section 2.9 No Other Representations and Warranties. Except for the representations and warranties expressly set forth in this Article II, (i) neither [Citra] nor any other person or entity makes, or shall be deemed to have made, any representation or warranty (whether express or implied) on behalf of [Citra], the Purchased Assets, the Assumed Liabilities, the Services or the Transactions, and (ii) [Citra] hereby disclaims any such representation or warranty, express or implied, oral or written, including any implied warranty or representation as to condition, value, merchantability, validity, completeness, fitness or suitability for any specific purpose, or as to future revenue, profitability or success of the Contracts, the other Purchased Assets, the Assumed Liabilities or the Services, notwithstanding the delivery or disclosure to [Carenet] . . . of any materials, documentation or other information during the course of due diligence or any negotiation process . . . .[13]

Under Delaware law interpreting similar contractual provisions, Section 2.9, without more, likely would not preclude Carenet's reliance on extra-contractual representations.[14] There is, however, "more" in this case, namely the critical clause in which Carenet confirmed it was not relying on any such representations. In Section 3.6 of the Purchase Agreement, Carenet stated:

> Section 3.6 Acknowledgement of Seller Representations and Warranties. [Carenet] acknowledges that, except for the representations and warranties contained in Article II, it is not relying on any representation or warranty (whether express or implied) by or on behalf of [Citra] or any other person or entity in connection with the Transaction Documents or the Transactions, notwithstanding the delivery or disclosure to [Carenet] . . . of any materials, documentation

---

[13] Purchase Agreement § 2.9.

[14] *See FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016) (holding that, in order to bar fraud claims, a disclaimer of reliance "must come from the point of view of the aggrieved party").

8

or other information during the course of due diligence or any negotiation process (including information memoranda, data room materials, projections, estimates, management presentations, budgets and financial data and reports).[15]

In Section 3.6, Carenet further acknowledged that it was a "sophisticated party" that "made its own independent investigation, review and analysis regarding [Citra], the Contracts, and the Services . . . ." Carenet expressly agreed that it decided to proceed with the transaction on the basis of its own investigation and the representations and warranties contained in Article II of the Purchase Agreement.[16]

Finally, the Purchase Agreement included a standard integration clause in which the parties agreed that the Purchase Agreement and associated transaction documents constituted the parties' entire agreement:

> Section 7.1 <u>Entire Agreement; Assignment; Successors</u>. This Agreement, together with the other Transaction Documents, constitute [sic] the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior and contemporaneous representations, warranties, covenants, agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof.[17]

Citra contends these clauses, taken together, amount to Carenet's unequivocal waiver of any reliance on any extra-contractual representations. According to Citra, the failure to enforce the parties' agreement regarding the representations they were or were not making and relying upon would be antithetical to Delaware's pro-

---

[15] Purchase Agreement § 3.6.
[16] *Id.*
[17] *Id.* § 7.1.

contractarian roots. Carenet, on the other hand, contends that foreclosing its fraud and misrepresentation claims would fly in the face of Delaware's policy against fraud.

It is true that Delaware has a firm public policy against fraud. It equally is true that Delaware prides itself on having *and adhering to* a body of efficient commercial laws and precedent in which sophisticated contracting parties' voluntary agreements are enforced as written.[18] Although Carenet attempts to pit these policies against each other, they are not in conflict. Rather, sophisticated parties are free to limit the possibility of future claims of fraud or misrepresentation by contractually specifying what representations the parties are and are not making and relying upon. Such clauses reduce the risk that the parties later will become embroiled in litigation regarding what was or was not said.[19] Delaware courts routinely enforce these anti-reliance provisions as long as the contractual language, when read as a whole, "can be said to add up to a clear anti-reliance clause by which the plaintiff has

---

[18] *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *see also Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004); *IAC Search, LLC v. Conversant LLC*, 2016 WL 6995363, at *6 (Del. Ch. Nov. 30, 2016).
[19] *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006).

contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[20]

For example, in *Prairie Capital III, L.P. v. Double E Holding Corp.*, the Court of Chancery dismissed fraud claims based on extra-contractual representations because the plaintiff/buyer specifically acknowledged in the parties' stock purchase agreement that it (i) conducted independent due diligence, (ii) was relying on that due diligence and the express representations and warranties in the agreement, and (iii) was not relying on – and expressly was disclaiming – any other representations.[21] Similarly, in *ITW Global Investments Inc. v. American Industrial Partners Capital Fund IV, L.P.*, this Court dismissed fraud claims based on misrepresentations allegedly made during the course of the parties' negotiations regarding their securities purchase and sale agreement.[22] The *ITW Global* Court held the plaintiff waived any reliance on those extra-contractual representations by warranting in the agreement that it was not relying on any representations other than those expressly contained in the agreement.[23] Delaware trial courts have dismissed fraud claims based on extra-contractual representations in several similar cases,[24]

---

[20] *Kronenberg*, 872 A.2d at 593.
[21] 132 A.3d 35, 50 (Del. Ch. 2015). The parties' stock purchase agreement also included a standard integration clause much like the language in the Purchase Agreement at issue in this case.
[22] 2015 WL 3970908, at *8 (Del. Super. June 24, 2015).
[23] *Id.*
[24] *See, e.g., IAC Search*, 2016 WL 6995356 (dismissing fraud claims premised on information provided during due diligence because the agreement contained clauses in which (i) the seller disclaimed making any representations other than those in the agreement, (ii) the buyer warranted

11

and the Delaware Supreme Court affirmed one such decision, holding that anti-reliance clauses "emphasize[] to an objective reader that the merger negotiation process would not be one during which [the acquiring company] could reasonably rely on oral assurances."[25]

The clauses at issue in this case are, if anything, more plainly worded than those at issue in *Prairie Capital* and *ITW Global*. Citra made clear in Section 2.9 that the only representations it was making were those in the Purchase Agreement. Carenet expressly stated in Section 3.6 that it was not relying on extra-contractual representations and only was relying on its due diligence and the contractual representations. Both sides agreed that the Purchase Agreement and related documents constituted the parties' complete agreement. To allow Caremark's claims to proceed in the face of such disclaimers would create a "double liar" problem. As the Court of Chancery explained in *Abry Partners V, L.P. v. F&W Acquisition LLC*:

---

it was a sophisticated party that had conducted due diligence, and (iii) the buyer acknowledged that seller was not making any representations other than those in the agreement); *Progressive*, 2002 WL 1558382 (dismissing fraud and misrepresentation claims because licensor could not reasonably rely on oral representations when the license agreement contained a clause in which both sides agreed that no party had made any representation to induce the other to execute the agreement and no party had executed the agreement in reliance on an extra-contractual representation); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001) (dismissing fraud claims on the basis of contractual disclaimers in which buyer agreed that it was not relying on any forecasts or predictions furnished by seller that were not the subject of a warranty in the parties' written agreement).

[25] *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 114 (Del. 2012) (applying New York law but noting the result would be the same under Delaware law) (quoting *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 32 (Del. Ch. 2001)).

> To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.[26]

Although Carenet may now regret its agreement to disclaim any reliance on representations other than those in the Purchase Agreement, to permit claims based on extra-contractual representations to proceed effectively would allow Carenet to escape its own fraudulent representations regarding reliance.

Carenet, however, argues the extra-contractual representations may be considered by the Court to show that Citra's contractual representations – although facially true – created a false impression and therefore amounted to a false or misleading representation.[27] This argument primarily is premised on two cases: *Norton v. Poplos* and *Prairie Capital*.[28] Neither case rescues Carenet from the effect of its unambiguous contractual waiver.

---

[26] 891 A.2d at 1058.

[27] Pl.'s Answering Br. in Opp'n to Defs.' Mots. to Dismiss (hereinafter "Pl.'s Answering Br.") 7, 10.

[28] Carenet also relies on *TransDigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881 (Del. Ch. May 29, 2013). That case, which relates to Carenet's fraudulent concealment argument, is addressed in Section I(A)(2), below.

13

In *Norton*, the Delaware Supreme Court held buyers of a commercial property could pursue a claim for misrepresentation despite language in the real estate sales contract stating that the buyers were not relying on any written or oral representations not contained in the contract.[29] The contract at issue stated the property was zoned "M-1," which was true, but incomplete, because the industrial park's building committee also had to give prior approval for many uses ordinarily permitted under M-1 zoning. The Delaware Supreme Court held that "although a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief."[30] Based on that reasoning, the Court allowed the buyers to proceed with their innocent misrepresentation claim.

In *Prairie Capital III, L.P.*, as discussed above, the Court of Chancery dismissed several fraud claims based on extra-contractual representations because the parties' contract contained unambiguous anti-reliance language that precluded the plaintiff's reliance on any such representations. Sidestepping this portion of the ruling, Carenet instead relies on the Court's statement that "[a] party may use

---

[29] 443 A.2d 1, 3 (Del. 1982).
[30] *Id.* at 5.

external sources of information to plead that a contractually identified fact was false or misleading[.]"[31]

Carenet's reliance on these cases is problematic for a number of reasons. First, in several cases that post-date the *Norton* decision, Delaware courts have explained that *Norton* "involved simple real estate contracts having boilerplate, unnegotiated disclaimer language" and therefore was distinguishable from cases involving highly sophisticated parties who were assisted by industry consultants and experienced legal counsel and who entered into "carefully negotiated disclaimer language after months of extensive due diligence."[32] Second, the quotation from *Prairie Capital* on which Carenet relies is taken out of context of language that precedes and follows it. In context, the quote reads:

> For arms' length counterparties, therefore, contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim. A party may use external sources of information to plead that a contractually identified fact was false or misleading, but a party cannot point to extra-contractual information and escape the contractual limitation by arguing that the extra-contractual information was incomplete.[33]

As an initial matter, this Court rejects Carenet's *ipse dixit* argument that the failure to disclose receipt of oral notice rendered misleading a contractual representation regarding written notice. The fundamental premise underlying that

---

[31] *Prairie Capital*, 132 A.3d at 52; *see* Pl.'s Answering Br. 7.
[32] *Great Lakes*, 788 A.2d at 555.
[33] *Prairie Capital*, 132 A.3d at 52.

15

reasoning is flawed. By expressly giving a representation about the receipt (or lack thereof) of written notice, the parties limited the scope of the representation to that type of notice. The fact that oral notice might have been received does not make the representation about written notice misleading. Moreover, Carenet's argument seeks to do precisely what *Prairie Capital* says is not permitted: escape the anti-reliance clause and the limits of Section 2.4(d) by arguing that Citra's disclosures were incomplete. Delaware case law is clear that sophisticated parties who craft and negotiate contractual limitations regarding what representations they are relying on may not escape those limitations by arguing that other, extra-contractual representations made the contractual representations misleading.

**2. Defendants cannot avoid the antireliance clause by arguing the clause does not apply to material omissions or fraudulent concealment of information.**

Carenet next attempts to avoid the anti-reliance clause's limitations by arguing the clause only applies to overt misrepresentations and does not bar claims for fraudulent concealment or fraudulent omissions. In support of this argument, Carenet primarily relies on the Court of Chancery's decision in *TransDigm Inc. v. Alcoa Global Fasteners, Inc.*[34] In *TransDigm*, the Court of Chancery refused to dismiss claims for fraudulent concealment, notwithstanding the presence of an anti-reliance clause in the contract, because the Court concluded the disclaimer did not

---

[34] 2013 WL 2326881.

16

apply to extra-contractual omissions or active concealment. Defendants, on the other hand, argue *TransDigm* factually is distinguishable from this case, and, in any event, more recent cases have called into question the *TransDigm* Court's reasoning.

Delaware law establishes that fraud may occur in three ways: (1) an overt misrepresentation, (2) an omission in the face of a duty to speak, or (3) deliberate concealment of a material fact.[35] In *TransDigm*, the Court of Chancery concluded that an anti-reliance clause precluded fraud claims to the extent they were based on overt misrepresentations, but did not bar fraud claims based on omissions or active concealment. The alleged fraud in that case arose in connection with a stock purchase agreement. The buyer alleged that during the parties' negotiations the seller failed to reveal, and in fact actively concealed, the fact that a key customer intended to shift a large portion of its business to a competitor. The seller also allegedly concealed the fact that the same customer had been offered and accepted a 5% price discount effective after the closing date. The stock purchase agreement contained an anti-reliance clause in which the buyer represented that it had undertaken the due diligence necessary to make an informed decision and was entering into the stock purchase agreement "without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or

---

[35] *Stephenson*, 462 A.2d at 1074.

17

otherwise, . . . except as expressly set forth in this Agreement."[36] The Court of Chancery nevertheless refused to dismiss the buyer's fraud claim to the extent it relied on TransDigm's active concealment of material facts, concluding the anti-reliance clause did not "clearly disclaim reliance on the type of concealment and omission" alleged by the buyer.[37]

In reaching that conclusion, the *TransDigm* Court distinguished the stock purchase agreement's anti-reliance clause from those in other cases in which Delaware courts dismissed fraud claims based on omissions or concealment. In those cases, the *TransDigm* Court explained, the anti-reliance clauses at issue "contained language expressly disclaiming reliance on both the *omission* of information and extra-contractual *representations*."[38] The absence of similar language in the stock purchase agreement persuaded the *TransDigm* Court that the fraudulent concealment and fraudulent omissions claims could proceed.

Delaware courts have declined to follow *TransDigm* in two more recent decisions. First, in *Prairie Capital*, the Court of Chancery held that an anti-reliance clause barred fraud claims based on both overt misrepresentations and omissions even though the clause did not expressly state that the buyer was not relying on omissions. The *Prairie Capital* Court disagreed with the *TransDigm* Court's

---

[36] 2013 WL 2326881, at *7.
[37] *Id.* at *9.
[38] *Id.* (citing *RAA*, 45 A.3d 107; *In re IBP*, 789 A.2d 14; *Great Lakes* 788 A.2d 544).

18

reasoning that a clause must expressly refer to omissions in order to bar a fraudulent omissions claim.[39] Similarly, in *Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P.*, the United States District Court for the District of Delaware held that an anti-reliance clause barred claims for both fraudulent representations and omissions even though the clause did not expressly refer to omissions.[40] Both those courts reasoned that anti-reliance clauses have a "representation defining effect" that extends to claims based on omissions.[41]

In my view, Section 3.6 bars Carenet's fraud claims based on both overt representations and omissions. The language in the Purchase Agreement unambiguously defines the universe of information on which Carenet relied in deciding to purchase the assets. The fact that Section 3.6 does not expressly refer to "omissions" is not, in my view, determinative. Citra and Carenet agreed to limit the representations on which they relied to those expressly contained in the Purchase Agreement. "The critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it."[42]

---

[39] *Prairie Capital*, 132 A.3d at 54.
[40] 176 F. Supp. 3d 387, 400-02 (D. Del. 2016).
[41] *Prairie Capital*, 132 A.3d at 54; *accord Universal*, 176 F. Supp. 3d at 402.
[42] *Prairie Capital*, 132 A.3d at 52.

The alternative conclusion reached by the *TransDigm* Court effectively would eviscerate these clauses' effect and eliminate sophisticated parties' ability to define the representations upon which they agreed to bargain. This is so, as the *Prairie Capital* Court persuasively explained, because virtually any misrepresentation can be re-framed as an omission.

> If a plaintiff could escape a provision like [an anti-reliance clause] by re-framing an extra-contractual misrepresentation as an omission, then the clause would be rendered nugatory. When parties identify a universe of contractually operative representations in a written agreement, they remain in that universe. A party that is later disappointed with the written agreement cannot escape through a wormhole into an alternative universe of extra-contractual omissions.[43]

As to Carenet's argument that its fraud claim should survive because it is based on Defendant's active concealment of information, that position falters for at least two reasons. First, even if *TransDigm* remains good law, the relevant contractual provisions in the Purchase Agreement materially are different from the clause at issue in *TransDigm*. Specifically, the *TransDigm* court distinguished its holding from other Delaware precedent on the basis that the anti-reliance clause at issue did not refer to "omissions" and did not disclaim the "accuracy or completeness" of information provided in due diligence.[44] Unlike that case, in Section 2.9 of the Purchase Agreement Citra expressly disclaimed making any

---

[43] *Id.* at 52-53.
[44] *TransDigm*, 2013 WL 2326881, at *9.

representation or warranty, including any implied warranty "as to condition, value, merchantability, *validity, completeness*, fitness or suitability for any specific purpose," notwithstanding the disclosure to Carenet of information during the negotiation process.[45] That express repudiation of the validity and completeness of information provided during due diligence distinguishes the Purchase Agreement from the stock purchase agreement at issue in *TransDigm*.

Second, even if a fraudulent concealment claim theoretically could be alleged despite Sections 2.4(d), 2.9, and 3.6 of the Purchase Agreement, Carenet does not adequately plead one here. To plead a fraud claim based on active concealment, the plaintiff must allege that the defendant took an affirmative action designed or intended to prevent the discovery of material facts and which does in fact prevent such discovery.[46] In *TransDigm*, the buyer pleaded that before the parties began negotiations, the seller knew material facts regarding price and order reductions relating to a key customer. During the parties' negotiations, however, the seller concealed that information despite direct questions from the buyer relating to it.[47] Here, in contrast, Carenet does not plead that Defendants' alleged instruction to employees not to disclose the June 21st call with Humana prevented Carenet from

---

[45] Purchase Agreement § 2.9 (emphasis added).
[46] Restatement (Second) of Torts § 550 (1977); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004).
[47] *TransDigm*, 2013 WL 2326881, at *2.

21

discovering that information. Carenet has not pleaded that Citra made representations after that phone call or that Carenet asked about such information after that call. Carenet has not pleaded, and presumably cannot plead, that it would have discovered this information before closing had Defendants not instructed their employees as they allegedly did.

### 3. The anti-reliance provisions in the Purchase Agreement apply with equal force to Carenet's claims against Great Point.

Finally, Carenet argues that even if its claims against Citra are barred by Section 3.6, that Section does not prohibit fraud or negligent misrepresentation claims against Great Point because Great Point was neither a party to the Purchase Agreement nor a third-party beneficiary thereunder. This argument misses its mark. It is of no moment that Great Point is not a party to the agreement or a third-party beneficiary.[48] Section 3.6 operates to bar Carenet from making any claims based on any extra-contractual representations; the disclaimer is not expressly or impliedly limited to representations by contracting parties or third-party beneficiaries. To the contrary, Carenet disclaimed reliance on extra-contractual representations and warranties made by Citra "or any other person or entity."[49] As explained above, to

---

[48] Great Point in fact argues it is a third-party beneficiary of the Purchase Agreement, pointing to Section 5.3, which contains Carenet's indemnification obligations. I need not address this argument in light of the conclusion reached above.

[49] Purchase Agreement § 3.6.

22

allow Carenet to now pursue claims based on those very same representations would countenance a "double-liar" scenario.

## B. Carenet has not adequately pleaded that the misrepresentations were material.

Carenet also cannot adequately plead its fraud or negligent misrepresentation claims in this case because the Purchase Agreement demonstrates that Citra's receipt of oral notice regarding a customer's intent to terminate a Contract was not material to Carenet's decision to enter into the Purchase Agreement. Although Carenet alleges in the complaint that it "would not have entered [into] the Purchase Agreement had it been aware of Humana's intent to terminate the Nurse Advice Line Contracts[,]"[50] the terms of the Purchase Agreement demonstrate that the oral notice Citra received was not something that Carenet deemed material.

Carenet represented that it was not relying on any representations other than those expressly contained in the Purchase Agreement.[51] Carenet further represented that in deciding to proceed with the transaction, Carenet relied upon: (i) its own independent investigation, and (ii) the representations and warranties set forth in the Purchase Agreement.[52] The only representation in the Purchase Agreement regarding notice of a customer's intent to terminate a Contract is Section 2.4(d), which is limited to whether Citra received written notice of such intent. If Carenet

---

[50] Compl. ¶ 41.
[51] Purchase Agreement § 2.9.
[52] *Id.* § 3.6.

23

believed Citra's extra-contractual representation regarding oral notice were material, Carenet should have negotiated to include that representation in the Purchase Agreement.[53] By limiting the contractual representation to one about written notice, and by representing that it was making its decision to enter into the Purchase Agreement solely based on the contractual representations and its own independent investigation, Carenet unequivocally indicated that other information it received was not material to its decision.[54]

## C. The complaint is dismissed with prejudice because amendment would be futile.

Finally, Carenet asserts that, to the extent the Court dismisses the claims, the dismissal should be without prejudice and with leave to file an amended complaint. But, the deficiencies in Carenet's complaint are not ones that can be cured through an amended pleading. The Purchase Agreement precludes Carenet's claims for fraud and negligent misrepresentation, so there are not additional or different facts upon which Carenet successfully could plead that the extra-contractual representations were material or that Carenet justifiably relied upon them. Accordingly, the complaint must be dismissed with prejudice.

---

[53] *See Progressive*, 2002 WL 1558382, at *8-9 (reasoning that if buyer believed representations regarding cost or market appeal were important to its decision to contract, buyer could have negotiated to have those representations reduced to writing and included in the contract).

[54] Again, this limitation regarding materiality applies with equal force to Carenet's claims against Great Point, as discussed above in Section (A)(3).

24

## CONCLUSION

For the forgoing reasons, Defendants' Motions to Dismiss are **GRANTED**.

**IT IS SO ORDERED.**