**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

PARTNERS & SIMONS, INC. and )
HY CONNECT, INC., )
         )
               Plaintiffs, )
         )
           v. )     C.A. No. 2020-0776-MTZ
         )
SANDBOX ACQUISITIONS, LLC, )
SANDBOX ADVERTISING, INC., )
ALARIS ROYALTY CORP., NOVO )
ADVISORS, LLC AND CURTIS )
KRAWETZ, )
         )
             Defendants. )

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS PURSUANT TO COURT OF CHANCERY RULE 12(B)(6)

**WHEREAS**, upon consideration of the Motion to Dismiss filed on December 2, 2020 (the "Motion") by Defendants Sandbox Acquisitions, LLC ("Acquisitions"), Alaris Royalty Corp. ("Alaris," and collectively with Acquisitions and Defendant Sandbox Advertising Inc., the "Sellers," and each a "Seller"), and Curtis Krawetz (together with Sellers, "Defendants"),[1] as well as any oppositions thereto, it appears as follows:[2]

---

[1] Docket Item ("D.I.") 23; D.I. 24; D.I. 25. Acquisitions moved separately, but joined Alaris and Krawetz's motion; the parties briefed the motions together. *See* D.I. 23; D.I. 70. Therefore, I refer to the motions collectively as one Motion.

[2] I draw the following facts from the Verified Complaint, available at D.I. 1 [hereinafter "Compl."], as well as the documents attached to and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

1

A. Plaintiffs Partners & Simons, Inc. and HY Connect, Inc. (collectively, "Buyers")[3] bring claims for fraud and breach of contract against Sellers, former equityholders of several affiliated entities that together comprised the advertising agency known as Sandbox ("Sandbox" or the "Company").[4] Buyers purchased all equity interests in Sandbox for $60 million (the "Transaction"), pursuant to an Equity Purchase Agreement (the "EPA") dated February 28, 2020 (the "Closing").[5] Buyers allege Sellers exercised their leverage and influence over Sandbox to knowingly perpetrate an accounting fraud, with assistance from their advisors, in connection with the Transaction.

B. In fall 2019, Buyers and Sellers began discussing Buyers' potential acquisition of Sandbox. On December 13, the parties agreed Buyers would buy all the equity in Sandbox for $62.5 million, subject to due diligence.

C. Sandbox's preferred unitholder, Alaris, held "step-in" rights to control the Company's management structure and composition and formally effectuate a sale if Alaris so desired.[6] Shortly after Buyers agreed to the purchase terms, Alaris

---

[3] Partners & Simons, Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts. HY Connect, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

[4] Those affiliated entities included Underline Communications, LLC; UNISON Resource Company, LLC; Goble & Associates, LLC; and Sandbox Advertising LP.

[5] Compl. Ex. A [hereinafter "EPA"].

[6] Compl. ¶ 22. Alaris acquired this right in October 2018 when it purchased Sandbox's outstanding senior debt for $14 million.

exercised those rights to change Sandbox's management structure in order to leverage a deal more favorable to Alaris. On December 19, Alaris removed Sandbox's managers and board members and installed Krawetz as the Company's sole manager and board member.[7] Krawetz had been Alaris's V.P. of Investments and Investor Relations and managed Alaris's Sandbox investment.

D.      Alaris also engaged two different firms to assist with the sales process: Lincoln International ("Lincoln") and Novo Advisors, LLC ("Novo"). In January 2019, at Alaris's direction, Sandbox engaged Lincoln to position the Company for acquisition and advise on the sales process. And in June 2019, Alaris directed Sandbox to appoint Novo as Alaris's "eyes and ears" to monitor Sandbox's business, specifically by managing cash operations; providing technical accounting support during due diligence; and conducting routine financial analyses.[8]

E.      Plaintiffs allege that between December 19 and Closing, with Krawetz controlling Sandbox on Alaris's behalf and overseeing Novo and Lincoln, Sellers cooked Sandbox's books to inflate its valuation and the Transaction's ultimate purchase price. Plaintiffs' allegations of the fraud are detailed, but as their

---

[7] The Complaint defines the "Company" and "Sandbox" as a group of affiliated entities, and does not specify which entity or entities Krawetz managed in these roles. *See id.* ¶¶ 1, 23. Krawetz signed the EPA as Acquisitions's Manager, and it appears Acquisitions was the holding company for all the Sandbox equity interests that were sold. *See* EPA, Preamble & Signature Pages.

[8] Compl. ¶ 24(b).

3

particularity is not challenged by the instant Motion, I do not relate them here. For now, it is enough to say that Sandbox's accounting practices were improper and inconsistent with GAAP and the Company's own revenue recognition policy, as Sellers overstated reported revenues and accrued accounts receivable ("accrued AR") and understated various expenses and liabilities. And as Closing loomed, Krawetz and Sandbox's executives leaned into the fraud, directly manipulating the Company's invoicing system. As alleged, the fraudulent acts were "common knowledge" to Sandbox's pre-Closing accounting and finance staff, Sellers, and their advisors, and everyone involved was or should have been aware that they violated GAAP standards.[9]

F.     Sellers and their advisors actively concealed the fraud from Buyers and continued to make false and misleading representations to push the Transaction toward Closing. Again, Plaintiffs tell a detailed and colorful story of Krawetz avoiding transparency for Buyers by controlling the flow of information to Buyers, including by controlling the Company's executives and advisors; and shielding himself and Alaris by communicating with Buyers through intermediaries, but also directly making knowingly false statements to Buyers about the accuracy of the Company's financial records.

---

[9] *Id.* ¶ 54.

G.     As Closing neared, Krawetz, Sellers, Novo, and other Company representatives strove to withhold information with the goal of "running out the clock."[10]   Suspicious, Buyers refused to proceed to Closing without additional information and assurances regarding the Company's accrued AR.  Sellers induced Buyers to proceed to Closing by agreeing to (1) an approximately $5 million reduction in purchase price; and (2) additional representations and warranties affirming that the remaining accrued AR was valid, collectible, and supported by customer documentation.  Sellers knew these representations and warranties were inaccurate, but agreed to them anyway to induce Buyers to close at the still-inflated price.

H.     Sellers allegedly did all this to benefit themselves by driving up Sandbox's pre-Closing revenue and earnings to support an inflated purchase price. The Company grossly overstated the bases for the EBITDA projections in Buyers' valuation model.   The Company's accounting fraud created approximately $6.1 million of fabricated EBITDA for 2019.   Buyers relied on Sellers' representations and warranties, and proceeded to Closing; they purchased Sandbox for $60 million, subject to post-Closing adjustments.  Because of the accounting

---

[10] *Id.* ¶ 71.

fraud, Buyers overpaid by approximately $37.2 million. Krawetz executed the EPA as Acquisitions's Manager.[11]

I.     On their own behalf and on behalf of the Company, Sellers made numerous representations and warranties in the EPA that were knowingly false when made in view of the accounting fraud.[12] Specifically, Section 4.7 was false and therefore breached because the financial statements delivered to Buyers were materially inaccurate, incomplete, and not in accordance with GAAP. Section 7 of the EPA requires Sellers to indemnify Buyers for breaches of false representations and warranties according to certain terms and processes.[13] Section 1.4 of the EPA governs the dispute process for a purchase price reduction.[14]

J.     Section 5.6 of the EPA provides:

Reliance. Each Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, such Buyer has relied solely upon its own investigation and the express representations and warranties set forth in Article III and Article IV, except in the case of fraud.[15]

K.     Despite doing extensive diligence with the assistance of Ernst & Young, Buyers did not discover the inflated EBITDA and underlying reasons for it

---

[11] *See* EPA, Signature Pages.

[12] *See id.* §§ 4.5(o)–(p), 4.7(b)–(d), (f), 4.14, 4.24(b), 4.26.

[13] *Id.* § 7.1.

[14] *Id.* § 1.4.

[15] *Id.* § 5.6.

6

before Closing. Post-Closing, Buyers gained access to the Company's personnel, books, and records, and discovered the discrepancies and inaccuracies in the Company's finances. Buyers pursued the dispute resolution procedures in EPA Sections 1.4 and 7.4.

a. On May 28, 2020, pursuant to Section 1.4(a), Buyers provided Sellers with a Final Closing Statement seeking approximately $6 million more than the number in Seller's Estimated Closing Statement. On June 28, Sellers delivered a Closing Statement Protest Notice challenging Buyers' calculations. Under Section 1.4(c), the parties were then required to refer their disagreement to an arbitrating accountant. On July 2, Buyers invited Sellers to begin the process of selecting that arbitrating accountant. Sellers responded on July 7, refusing to engage an arbitrating accountant. After Buyers' additional requests, Sellers refused again on July 24 and August 11.

b. On May 28, Buyers made a direct claim for indemnification under Section 7.4. Sellers timely responded on June 26, triggering the 30-day negotiation period for Buyers' claim. On July 7, Sellers also made a direct claim for indemnification, to which Buyers timely responded on August 5 and triggered a separate 30-day negotiation period. As of July 17, the parties agreed to engage in good faith negotiations; they held a call on July 24. Sellers would not discuss Buyer's fraud allegations, claiming that they were without merit or any "shred of

7

evidence."[16] On July 26, the negotiation period for Buyers' indemnification claim ended.

L.    On September 11, 2020, Buyers filed the Complaint in this action. Count I asserts fraud against Sellers. Count II asserts fraudulent conspiracy against Novo and Krawetz. Count III asserts a claim against Sellers for indemnification relating to Sellers' breaches of the EPA's representations and warranties. And Count IV asserts a breach of contract claim against Sellers relating to the EPA's dispute resolution process.

M.    On December 2, Acquisitions, Alaris, and Krawetz moved to dismiss Counts I, II, and IV pursuant to Court of Chancery Rule 12(b)(6).[17] That same day, Novo and Krawetz moved to dismiss all claims against them pursuant to Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.[18] The parties briefed the Motion, as well as the jurisdictional issues; I held argument on April 23, and took the Motion under advisement.[19]

N.    In a separate decision, filed contemporaneously with this Order, I considered Novo and Krawetz's motions pursuant to Rule 12(b)(2); held that this Court lacks personal jurisdiction over both of them; and dismissed Count II.

---

[16] Compl. ¶ 90.

[17] D.I. 23; D.I. 24.

[18] D.I. 22; D.I. 25.

[19] D.I. 76; D.I. 77.

O.    This decision considers Counts I and IV against Sellers for fraud and breach of contract.  The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[20]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[21]  This standard is "minimal"[22] and plaintiff-friendly.[23]  "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[24]  Despite this forgiving standard, the Court need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor

---

[20] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[21] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[22] *Id.* at 536.

[23] *See, e.g., Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

[24] *Cent. Mortg. Co.*, 27 A.3d at 536.

of the nonmoving party.[25]  "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[26]

P.    To state a claim for fraud,

the plaintiff must plead facts supporting an inference that:  (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[27]

Under Court of Chancery Rule 9(b), the elements of a fraud claim must be pled with particularity, although "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."[28]  "To satisfy Rule 9(b), a complaint must allege:  (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[29]  At bottom, "the plaintiff is required to allege the

---

[25] *See, e.g.*, *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[26] *Trados Inc.*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[27] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[28] Ct. Ch. R. 9(b).

[29] *Abry P'rs*, 891 A.2d at 1050.

circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[30]

Q.     "Under Delaware law, a breach of contract claim comprises three elements:  (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages."[31]

**IT IS HEREBY ORDERED**, this 26th day of July, 2021:

1.     The Motion is **DENIED**.

2.     Defendants contend that Count I must be dismissed because "Delaware law requires that the fraud damages must state with particularity how they derive from the fraud."[32]  But as this Court has recognized, Delaware law does not mandate a plaintiff plead damages arising from fraud with particularity.

> Even when a plaintiff asserts a fraud claim, damages do not have to be pled with particularity.  What has to be pled with particularity are the circumstances constituting fraud or mistake.  Unless a complaint seeks special damages, damages can be pled generally.  A plaintiff adequately pleads damages resulting from fraud when the complaint sufficiently puts defendants on notice of the precise way in which defendant may have been harmed.[33]

---

[30] *Id.*

[31] *E.g.*, *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018).

[32] D.I. 25 at 5.

[33] *Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *9 (Del. Ch. Aug. 25, 2020) (quoting *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *21 (Del. Ch. Feb. 28, 2020), and *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 189435, at *6 (Del. Ch. Apr. 16, 1996)); *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003) ("Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and

Plaintiffs have adequately pled harm from overpaying under the EPA.[34]

3.    Defendants next contend that Count I must be dismissed as duplicative, in that "Plaintiffs seek the same damages there as they do in their breach of contract claim in Count III."[35]  But that argument falls short at the pleading stage.  Even if a breach of contract and fraud claim are presumably based on the same conduct, "it is quite possible that the measure of damages for the fraud claim would be different given the public policy against fraud."[36]  "As a matter of black-letter law, the measure of damages for a tort like fraud is broader, more flexible, and more encompassing than the remedy for a breach of contract, even when expectancy is the

---

contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."); *id.* at 146–47 ("The court is unconvinced that Wexford has not adequately alleged damages.  Wexford has alleged that it suffered damages because of its decision to participate in the February 2001 Offering, which was based on the false representations made by the defendants.  This allegation is stated with enough particularity to satisfy the requirements of Rule 9(b)."); *Carlton Invs.*, 1996 WL 189435, at *6 n.8 (stating that "[a]lthough defendants contend that Rule 9(b) requires that the plaintiff allege the damage element of fraud with particularity, I note that the Rule only requires that the circumstances constituting fraud be stated with particularity," as damages are adequately pleaded where an allegation is more than conclusory and sufficiently puts defendants on notice of plaintiff's harm (alterations and internal quotation marks omitted)).

[34] *See Am. Auto. Ass'n of N. Calif. v. Barnes Assocs., Inc.*, 2020 WL 4729063, at *5–6 (Del. Ch. Aug. 13, 2020) (ORDER).

[35] D.I. 25 at 5.

[36] *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *3 (Del. Ch. Dec. 31, 2019) (ORDER) ("Even if one assumes for the sake of argument that InTouch's contract claim for breach of Section 17.2 and its fraud claim based on statements made in Section 17.2 involved the same conduct, it is quite possible that the measure of damages for the fraud claim would be different given the public policy against fraud.").

measure."[37]  Thus, at the pleading stage, a plaintiff is not required to articulate exactly how the fraud and breach of contract damages diverge: "[i]t is simply not the case that damages in tort are generally likely to be co-extensive with damages in contract, and at a minimum, it is not possible to say that at the pleading stage."[38]

    4.    Plaintiffs have sufficiently differentiated fraud and contract damages, including by seeking rescissory damages for the fraud claims.[39]  Further, Plaintiffs' contract claims for breaches of the EPA's representations and warranties are subject to a $300,000 "mini-basket" and a $7.5 million damages cap.[40]  Plaintiffs' fraud claim for $37 million is not subject to these strictures.  These distinctions are

---

[37] *Barnes*, 2020 WL 4729063, at *1.

[38] *Id.* at *5.

[39] *See, e.g.*, *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2015 WL 3970908, at *7 n.103 (Del. Super. Ct. June 24, 2015) ("Additionally, because Count II alleges damages for rescission or rescissory damages, it is not barred as a 'rehash' of the Complaint's breach of contract damages."); *Novipax Hldgs. LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Ct. Nov. 28, 2017) ("This Court has twice held that a claim for rescission or recessionary damages separates a fraudulent inducement claim from breach of contract damages."); *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020) ("Under the facts pled in this case, the Court finds that Firmenich's Amended Complaint for rescissory damages sufficiently distinguishes the breach of contract claim from the fraudulent inducement claim.  It does not appear to the Court to matter whether the difference in damages is based on the actual method of calculation, or whether the difference in actual recoverable damages constitutes a legal distinction.  The Court finds that the fraud and contract claims alleged in this case may proceed in a parallel manner.").

[40] *See* EPA § 7.7(b)–(c).

sufficient to carry Plaintiffs' fraud claims over the Motion, as "[q]uite obviously, the measures are not the same."[41]

5.      Defendants next contend that Plaintiffs' fraud claim is barred by the EPA's anti-reliance provision in Section 5.6.[42] Delaware courts enforce clear anti-reliance provisions.[43] "[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim."[44] "To be effective, a contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the

---

[41] See Barnes, 2020 WL 4729063, at *5–6 ("It is simply not the case that damages in tort are generally likely to be co-extensive with damages in contract, and at a minimum, it is not possible to say that at the pleading stage. . . . In this case, the distinction is even more striking because the Agreement contains baskets and caps that limit a contractual recovery. Under those provisions, the Buyer's maximum recovery is approximately $1,020,000. Under a fraud recovery, it is uncapped and thus could exceed $65 million. Quite obviously, the measures are not the same.").

[42] EPA § 5.6 ("Each Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, such Buyer has relied solely upon its own investigation and the express representations and warranties set forth in Article III and Article IV, except in the case of fraud.").

[43] See, e.g., Prairie Cap. III, L.P. v. Double E Hldg. Corp., 132 A.3d 35 (Del. Ch. 2015); Abry P'rs, 891 A.2d at 1058–59; Kronenberg v. Katz, 872 A.2d 568, 593 (Del. Ch. 2004).

[44] Abry P'rs, 891 A.2d at 1057.

contract."[45] Such provisions must "identify the specific information on which a party has relied and which foreclose reliance on other information."[46] To be effective against fraud claims, a disclaimer must unambiguously "ensure the preclusion of fraud claims for extra-contractual statements."[47]

6.     Here, Section 5.6 cannot operate to bar Plaintiffs' fraud claim because it does not unambiguously disclaim reliance on extracontractual statements in the event of fraud.[48] To the contrary:  Section 5.6 expressly excludes fraud from its purview.  Plaintiffs agreed that, when entering into the EPA, they relied only upon their "own investigation and the express representations and warranties set forth in Article III and Article IV, *except in the case of fraud*."[49]

7.     This exception for fraud is consistent with several other EPA provisions that limit rights and remedies except in the context of fraud.  Section 8.18 includes a "Special Rule for Fraud":[50]

---

[45] *Prairie Cap.*, 132 A.3d at 51 (internal quotation marks omitted) (quoting *Kronenberg*, 872 A.2d at 593).

[46] *Id.* at 50 (citing *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012)).

[47] *See FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016), *aff'd*, 148 A.3d 1171 (Del. 2016) (TABLE).

[48] *See id.* ("Because the [anti-reliance provision] does not contain this type of unambiguous anti-reliance disclaimer by Buyer, those provisions are not sufficient to preclude its common law fraud claim relating to the Pre–Merger Materials.").

[49] EPA § 5.6 (emphasis added).

[50] *Id.* § 8.18.

> Notwithstanding anything herein to the contrary, in no event shall any limit or restriction on any rights or remedies set forth in this Agreement limit or restrict the rights or remedies of any party for the fraud by any other party or any Affiliate or representative of such other party.[51]

And Section 7.8 identifies the indemnification rights outlined in Article VII as the parties' sole and exclusive remedy in connection with the EPA—"[o]ther than . . . in the event of fraud."[52] Section 5.6's carveout for fraud means Defendants cannot rely on that provision to dismiss Plaintiffs' fraud claims.[53]

8.      In addition, Plaintiffs' fraud claims are premised on Sellers' specific representations and warranties in the EPA.[54] "Delaware law permits representations and warranties in a contract to form the basis for fraud claims even where a purchaser has disclaimed reliance on extracontractual representations in the contract."[55] This is because anti-reliance provisions generally "define the universe of information that is in play for purposes of a fraud claim,"[56] and such provisions permit a plaintiff to

---

[51] *Id.*

[52] *Id.* § 7.8.

[53] *See id.* §§ 7.7(a), 7.7(b), 7.7(c), 7.8, 8.18.

[54] *See id.* §§ 4.5(o)–(p), 4.7(b)–(d), (f), 4.14, 4.24(b), 4.26.

[55] *Swipe Acq. Corp.*, 2020 WL 5015863, at *10 (quoting *Prairie Cap.*, 132 A.3d at 49–59 (analyzing the effect of an anti-reliance clause and holding that the fraud claim "largely survives at the pleading stage to the extent that [plaintiff] relies on representations in the SPA"), and citing *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *4–8 (Del. Ch. July 31, 2018) (holding that an anti-reliance clause did not bar a fraud claim based on a representation in the contract)).

[56] *Prairie Cap.*, 132 A.3d at 52.

"rel[y] on representations and warranties."[57]  The Complaint includes detailed factual allegations that give rise to the reasonable inference that Sellers knowingly misrepresented information about the Company's finances and accounting practices that were the subject of Sellers' representations and warranties.[58]  And to the extent Plaintiffs' fraud claims rely on "extra-contractual" statements, they "may use external sources of information to plead that a contractually identified fact was false or misleading."[59]  The Motion is denied as to Count I.

9.      Finally, Plaintiffs claim Sellers breached Section 1.4(c) of the EPA by refusing to refer a dispute regarding Buyers' Final Closing Statement to an arbitrating accountant.  Defendants argue that Count IV must be dismissed because Plaintiffs waived their right to pursue EPA's post-Closing dispute resolution procedures when Plaintiffs failed to timely deliver the Final Closing Statement within 90 days after the Closing Date, or no later than May 28, 2020.  Defendants rely on an email attached as an exhibit to the Motion in support of this theory.[60]  But that document is outside the Complaint, and therefore I do not consider it on the

---

[57] *Swipe Acq. Corp.*, 2020 WL 5015863, at *10.

[58] *See* D.I. 56 at 27–28.

[59] *Prairie Cap.*, 132 A.3d at 52 ("A party may use external sources of information to plead that a contractually identified fact was false or misleading, but a party cannot point to extra-contractual information and escape the contractual limitation by arguing that the extra-contractual information was incomplete.").

[60] *See* D.I. 25 at 24–26.

Motion.[61] Plaintiffs have alleged that they timely delivered the Final Closing Statement by May 28, and I must accept that allegation as true at the pleading stage.[62] Accordingly, the Motion to dismiss Count IV is denied.

*/s/ Morgan T. Zurn*

Vice Chancellor Morgan T. Zurn

---

[61] *See, e.g.*, *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) ("Matters extrinsic to a complaint generally may not be considered in a ruling on a motion to dismiss. Court of Chancery Rule 12(b) provides that if the court considers matters outside the pleadings, the motion shall be 'treated as one for summary judgment' and the parties must be given an opportunity to take discovery. On a motion to dismiss, the Court may consider documents that are 'integral' to the complaint, but documents outside the pleadings may be considered only in 'particular instances and for carefully limited purposes.'" (footnotes omitted) (quoting Ct. Ch. R. 12(b), and *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995))). "Whether a document is integral to a claim and incorporated into a complaint is largely a facts-and-circumstances inquiry," and "[t]he Court's context-specific analysis to determine whether a document is integral cautions against an effort to synthesize this precedent into a bright-line rule." *In re Gardner Denver, Inc.*, 2014 WL 715705, at *3 (Del. Ch. Feb. 21, 2014). However, "a general tendency is that the Court may conclude a document is integral to the claim if it is the source for the facts as pled in the complaint." *Id.* (alterations and internal quotation marks omitted).

Defendants argue that "Plaintiffs here have incorporated the contents of the Final Closing Statement into the Complaint and rely on the timely transmission of the document to support its breach of contract claim in Count IV. Judicial notice [of the email from Plaintiffs' counsel attaching the Final Closing Statement], therefore, is appropriate." D.I. 25 at 25 n.4 (citing Compl. ¶¶ 80, 135). The Complaint's allegations that mention the Final Closing Statement and its delivery are insufficient to render the email attached to the Motion incorporated by reference or integral to it. The Complaint does not reference the email, nor does it quote a portion of it. *See Gardner Denver*, 2014 WL 715705, at *8 (citing *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *1 n.1 (Del. Ch. July 24, 2009)). At most, the Complaint incorporates the Final Closing Statement by reference. On the Motion, I therefore do not consider the email cited by Defendants.

[62] *E.g.*, *Savor*, 812 A.2d at 896–97.